# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

ROGER LASSEN, JR., individually and on : \
behalf of all other similarly situated individuals, : \
: \
Plaintiff, : \
: \
v. : \
:      Civil Action No.: 3:13-cv-01529-VAB \
: \
HOYT LIVERY, INC., SANTO SILVESTRO, : \
and LYNDA SILVESTRO, : \
: \
Defendants. : \
:

## DEFENDANTS' MOTION TO DECERTIFY
## THE FLSA COLLECTIVE ACTION AND RULE 23 CLASS ACTION

Defendants Hoyt Livery, Inc., Santo Silvestro and Lynda Silvestro hereby move to decertify the class and collective action claims certified in this matter prior to the commencement of class discovery. The Court's initial rulings on class and collective action certification were based on a very limited record that consisted of little more than Plaintiffs' self-serving assertions of universal overtime work by Defendants' livery drivers. Discovery has revealed that Plaintiffs' assertions in this regard were inaccurate, and the record now reflects wide variation in the circumstances of the drivers that deprive Plaintiffs' claims of any common thread that can hold this case together for purposes of trial on a class or representative basis. The questions at issue in the litigation, which boil down to inquiries about what each driver was doing on a day-to-day basis over a period of several years, are fundamentally individualized and not susceptible to any common answer. The Court would need to analyze not only the amount of time that each driver spent transporting customers, but also what each driver was doing between those trips, in order to assess whether and to what extent each driver had any entitlement to overtime pay. For that reason, a trial would either require that each and every member of the class testify regarding his

**DEFENDANTS REQUEST ORAL ARGUMENT**

particular circumstances or that the case be broken down to dozens of individual mini-trials to address the circumstances of each driver.  Both of these outcomes would result in a massive expenditure of private and judicial resources, and neither outcome is compatible with class action treatment or the Supreme Court's guidance on the use of the class certification device.  The Court should, therefore, decertify Plaintiffs' class and collective action claims and allow this case to proceed to trial on Plaintiffs' individual claims and allow this case to come to its overdue conclusion.

## I.     PROCEDURAL BACKGROUND

Plaintiff Roger Lassen filed this action on October 18, 2013, claiming that Defendants violated the overtime provisions of the Fair Labor Standards Act ("FLSA") and the Connecticut Minimum Wage Act ("CMWA") by failing to pay him and all other Hoyt livery drivers time and one-half for hours worked in excess of 40 during unspecified workweeks. Dkt. 1.

On February 12, 2014, before class and expert discovery, Mr. Lassen moved to conditionally certify an FLSA collective and to certify a class under Fed. R. Civ. P. 23 for purposes his CMWA claim.  Dkts. 21-22.  At that time, neither Mr. Lassen nor any collective or class member had been deposed in this case.  The only depositions that had taken place were those of Lynda and Santo Silvestro, and Burton Dupee--a driver who opted out of this action and filed a separate lawsuit against Defendants.  Dkt. 67; D. Conn. No. 13-cv-01185-DFM.

On September 17, 2014, the Court (Myer, J.) conditionally certified an FLSA collective consisting of "all full-time limousine drivers at Hoyt in the three years prior to the Court's order."  Dkt. 43, p. 12.  Likewise, the Court certified a Rule 23 CMWA class consisting of all persons who have worked for Hoyt as full-time limousine drivers since October 18, 2011.  *Id*., p. 22.  Plaintiffs then issued notice of opt-in and opt-out rights to the employees at issue.  Out of 89

eligible employees, only 16 (including Mr. Lassen) joined the conditionally certified FLSA collective, and 41 drivers (or 46% of eligible participants) opted out of this action entirely.  Six of the opt-in Plaintiffs refused to participate in discovery and have been dismissed from the FLSA collective.[1]  Thus, the CMWA class consists of 47 drivers, 10 of whom are also members of the conditionally certified FLSA collective, and 37 of whom are absent class members.

Discovery regarding the collective and class began after Plaintiffs filed their certification and summary judgment motions.  Defendants deposed the opt-in Plaintiffs and produced approximately 18,000 pages of documents, while Plaintiffs again deposed Lynda and Santo Silvestro.  The Parties also engaged in expert discovery.  On March 30, 2015, Plaintiffs identified Joseph DeCusati, CPA, as an ostensible expert witness who purports to opine about the hours of work and overtime wages due to all putative collective and class members.  On April 8, 2016, Defendants moved to preclude Mr. DeCusati from offering expert testimony.  Dkt. 155, 156, 159.  That motion is pending.

Under the present scheduling order, the Parties must file a joint pre-trial memorandum and be trial-ready 30 days after the Court rules on the present motion.  Dkt. 148-149.

## II.     FACTUAL BACKGROUND

### A.     Hoyt's Family Run Transportation Business

Hoyt provides limousine and black car services to passengers in and around Fairfield County and nearby areas of New York.  3/21/14 Lynda S. Dec., ¶3-5, attached at Ex. 1.  It is a mom and pop business in the literal sense.  *Id*.  Lynda and Santo Silvestro have run Hoyt for approximately 29 years, and their two adult children now serve as full-time employees of the

---

[1] *See* Dkt. 113 (dismissing with prejudice FLSA claims of Plaintiffs Menard, Dominguez, Chaves, Stanfield, and Cardona, but preserving their CMWA claims).  Also, the Parties stipulated to the dismissal of Plaintiff Matouk's claims with prejudice.  Dkt. 121.

company.  Int. Responses, No. 5, attached at Ex. 2.  Hoyt's fleet consists of approximately 73
vehicles.  12/3/14 Lynda S. Tr. 60:2-8, excerpts at Ex. 3.

Due to the nature of the livery industry, Hoyt does not operate on a 9:00 a.m. to 5:00 p.m.
basis.  Hoyt caters to its clients' varying needs, which include business and personal travel--often
in the morning and evening, including travel to and from New York City and the nearby airports.
3/21/14 Lynda S. Dec., ¶4.  Customer demand varies substantially from day-to-day and from
hour-to-hour, requiring flexibility in all aspects of the operation, including the schedules of the
drivers.  Mann Tr. 76:5-23, excerpts at Ex. 4; Profeta Tr. 25:5-9; 29:8-10; 80:17-20, excerpts at
Ex. 5; Lassen Tr. 33:9-13, excerpts at Ex. 6.

**B.      Hoyt's Practices Regarding Driver Assignments, Compensation, and Records**

Hoyt's drivers receive driving assignments (called "runs," "trips," or ""routes") from
dispatchers.  Lassen Tr., 13:4-20; 32:8-10; Dupee Tr., 29:16-24, excerpts at Ex. 7.  A run usually
consists of picking up a customer at one location and dropping the customer off at another
location, but may in some cases also include waiting for the customer and making the return trip
or making multiple stops in the course of a journey with the same customer or group of
customers.  Lassen Tr. 59:23-60:3; 73:20-74:10; Mann Tr. 145:1-24.  Drivers do not have set
schedules; they communicate their availability to Hoyt, often on an *ad hoc* basis, and they are
free to accept or reject any run that is offered to them, based on their own preferences or
availability.   Mann Tr. 195:6-8; Profeta Tr. 112:8-11; Lassen Dec., ¶22, attached at Ex. 8;
Msteka Dec., ¶4, attached at Ex. 9; 3/21/14 Lynda S. Dec., ¶10; *but see* Dupee Tr. 29:16-25.
Likewise, Hoyt does not require any drivers to accept a particular or minimum number of runs
per workweek or to work a particular or minimum number of hours per workweek.  3/21/14
Lynda S. Dec., ¶19; Mann Tr. 98:4-9; 129:7-9; Msteka Dec., ¶4, 6; Other Driver Decs., ¶4, 6,

attached at Ex. 10.  In effect, drivers set their own schedules under this model.  Msteka Dec., ¶4, 6; Lassen Dec., ¶22; Other Driver Decs., ¶4, 6; 3/21/14 Lynda S. Dec., ¶10; Profeta Tr. 112:5-7; Verma Tr. 44:8-12, excerpts at Ex. 11.

Hoyt pays its drivers in a mutually beneficial manner that aligns with the realities of the livery industry.  Hoyt drivers receive generous wages for work that requires no special skill or licensure.  They receive commissions, consisting of a percentage of the base amount that Hoyt charges to the customer for each run, plus a gratuity that is at the customer's discretion.  3/21/14 Lynda S. Dec., ¶8; Mann Tr. 209:6-21.  Generally, drivers receive 20% of the base charge to the client, plus a discretionary gratuity that averages 20%.  *Id.*  Hoyt also pays drivers for time spent waiting for scheduled pickups.  3/21/14 Lynda S. Dec., ¶8, 17-18; 12/19/13 Lynda S. Tr. 22:14-23:2, excerpts at Ex. 13; 12/17/13 Santo S. Tr. 69:9-18, excerpts at Ex. 14.

Based on livery industry statistics, Hoyt is and has been among the highest paying livery companies in Connecticut.  3/21/14 Lynda S. Dec., ¶30.  Many Hoyt drivers have expressed their preference for the company's per-job compensation model.  *Id.* at ¶29; Msteka Dec., ¶8-9; Other Driver Decs., ¶8-9.  In fact, drivers did not complain about this compensation model, which was satisfactory even to Mr. Lassen, who never complained about it until his abrupt and dramatic separation from Hoyt.[2]  Lassen Tr. 85:24-86:3; Int. Response No. 14.

Under Hoyt's compensation model, neither the drivers nor Hoyt maintained comprehensive records of drivers' hours of work until the claims at issue in this lawsuit first surfaced.  3/21/14 Lynda S. Dec., ¶22; Mann Tr. 64:6-66:25; Verma Tr. 42:9-12.  Instead, Hoyt maintained records regarding the runs that each driver performed, including the pickup date,

---

[2] Mr. Lassen's employment with Hoyt ended after an incident concerning a run to which he felt entitled but did not receive.  Lassen Tr. 84:7-86:3; 123:2-125:23.  He later sent obscenity-laden text messages to Mr. Silvestro and filed this lawsuit.  3/21/14 Lynda S. Dec., ¶13; Lassen Tr. 85:24-86:3; 120:5-123:19; Lassen 8/12/13 Texts, attached at Ex, 15

time, and location, as well as the drop off location (but not the drop off time).  Sample Driver

Payment Detail, attached at Ex. 16; Sample Weekly Job Records,[3] attached at Ex. 17.  Hoyt's

records also show the amount paid to each driver for each run.  *Id.*  As discussed further below,

in June of 2013, Hoyt began requiring drivers to document their hours of work.  3/21/14 Lynda

S. Dec., ¶26-28.

        **C.**      **Dissimilarities in Drivers' Experiences Relating to Overtime**

        In conjunction with Plaintiffs' effort to pursue this matter on a class and  collective action

basis, Plaintiffs contend that <u>all</u> collective and class members worked more than 40 hours per

workweek and that a determination one way or the other can be made using representative proof,

without  individualized  inquiries.    Dkt.  1,  ¶27;  Dkt.  134,  ¶26.    Plaintiffs  premised  their

certification motions on these notion.    Dkt. 21-1, p. 5 (claiming "[a]ll full-time drivers are

expected to work at least six days a week, and as a result they work at least 50 hours per week");

Dkt. 22-1, p. 6, 14-15.  Even the Court observed in its initial certification order that "Hoyt Livery

did not provide any overtime pay to drivers who worked more than 40 hours per week," without

identifying any driver who in fact worked more than 40 hours during any given workweek.  Dkt.

43, p. 3.  The premise that all drivers in the class worked overtime has since been debunked.

Class discovery has revealed that (1) many drivers worked less than 40 hours per week; (2) most

drivers do not claim to have worked more than 40 hours during every workweek and cannot

identify any workweeks in which they exceeded 40 hours; and (3) whether any particular driver

worked more than 40 hours in any given workweek requires individualized inquiries that shed no

light on the hours of work of any other driver.

---

[3] Defendants have redacted confidential information from the Sample Driver Payment Detail and
Weekly Job Records attached at Exhibits 16 and 17, consistent with the Protective Order in this
case, in order to maintain the confidential designation attached to that document.

### 1.      Variations in Drivers' Claims about Their Hours of Work

The discovery record reflects wide variation in drivers' claims about their own working hours.  On one end of this spectrum are Mr. Lassen, Murphy Pierce, and Jeffrey Capone--the first Plaintiffs in this case, whose declarations influenced the Court's initial certification order.  Dkt. 43.  These three drivers claim that they worked more than 40 hours every workweek or nearly every workweek.  Dkt. 1, ¶27 (claiming "all other Limousine Drivers customarily and regularly worked between 50 and 100 hours per week"); Capone Dec., ¶5 (claiming he "worked at least 50 to 60 hours per week."), attached at Ex. 18; Pierce Dec., ¶3, attached at Ex, 19; Lassen Dec., ¶3. While Hoyt disputes these drivers' contentions, there is no question that these drivers claim to have worked substantially more than any of the other drivers who participated in discovery claim to have worked.  11/21/14 Lynda S. Dec., ¶4-6, attached at Ex. 20.

On the opposite end of the this spectrum, two-dozen drivers testified that they did not typically work 40-plus hour workweeks.   Msteka Dec., ¶7, 11; Other Driver Decs., ¶7, 11. Contrary to Mr. Lassen's, Mr. Capone's, and Mr. Pierce's claims, these drivers customarily and regularly worked less than 40 hours per workweek prior to June of 2013, and "never" worked more than 40 hours after that time.  *Id*.  While they leave room for the possibility that they may have exceeded 40 hours on rare occasions and by slim margins prior to June of 2013, their testimony directly refutes any contention that all drivers customarily and regularly worked more than 40 hours per workweek.  *Id*.  There is no evidence in the record suggesting that these drivers have underestimated their own working hours.

The other opt-in Plaintiffs who testified in this case stand somewhere between the opposing poles of this spectrum.  They do not claim to have worked more than 40 hours every workweek.  Mann Tr. 67:11-68:3 ("Q. . . . your best estimate is that it's possible there were weeks when you worked less than 40 hours, and there were weeks when you worked more than

40 hours. A. Yes."); 194:25-195:9; Mathon Tr. 58:9-11 ("Q. And do you know if there were any weeks when you worked less than 40 hours? A. Yeah."), excerpts at Ex. 21; Reid Tr. 53:6-8 ("Q. And are you also certain that there were weeks where you worked under 40 hours? A. I'm sure there were."), excerpts at Ex. 22; Yahya Tr. 58:6-12 ("Q. There were weeks when you worked less than 40? A. Yes, sir . . .  Q. So, some weeks you worked less than 40 hours. Correct?  A. Yeah."), excerpts at Ex. 23; Matouk Tr. 84:16-85:9 (weekly hours ranged from 30 to 60 hours), excerpts at Ex. 24; Verma Tr. 34:15-25; Mauricin Tr. 28:22-24.  As their testimony reflects, these opt-in Plaintiffs claim to have worked more than 40 hours sometimes, but it is not clear how often.

While the drivers at issue diverge on whether and how often they claim to have worked more than 40 hours per week, they share an inability to identify any weeks in which they did or may have exceeded 40 working hours.  Mann Tr. 63:15-22 ("Q. How often did you work more than 40 hours per week? A. Couldn't tell you."); 64:12-68:3; Verma Tr. 34:15-19 ("Q. Were there weeks during your employment with Hoyt that you did not work more than 40 hours in a particular week? A. I am sure there were. I don't remember clearly . . ."); Reid Tr. 53:6-8; Yahya Tr. 56:25-61:6; 167:24-168:6; Profeta Tr. 25:5-9; Mathon Tr. 58:9-11; Matouk Tr. 84:16-85:1; Mauricin Tr. 28:19-24.  In fact, no Plaintiff has identified any particular workweek in which he performed more than 40 hours of compensable work.

On top of lacking particular knowledge regarding their own hours of work, Plaintiffs have absolutely no knowledge regarding other drivers' work hours.  Yahya Tr. 59:20-21 ("Q. Do you know how many hours other drivers worked? A. No."); Mann Tr. 76:15-17 ("Q. Do you have any knowledge regarding the number of hours that any other drivers worked? A. No."); 195:20-25; Mathon Tr. 11:13-15 ("Q. Do you know how many hours other drivers work? A. No,

I don't…"); Profeta Tr. 114:11-13; Matouk Tr. 95:24-96:1; Reid Tr. 114:21-23; Mauricin Tr. 33:7-9; Lassen Tr. 73:17-19 ("I can't speak for them.").  Hoyt drivers work alone and they were not in positions to observe when other drivers were working.  Verma Tr. 132:23-133:5; Mauricin Tr. 32:18-33:

**2.      Each Driver's Hours Fluctuated from Day-to-Day and Week-to-Week**

Plaintiffs' inability to estimate if, when, or how often they may have exceeded 40 working hours per week is understandable, in light of their irregular schedules.  Class discovery has highlighted that drivers' work schedules and hours fluctuated every day and every week. Mann Tr. 66:19-23 ("Q. Did the number of hours that you worked per week vary? A. Yes. Q. Did it vary from week to week? A. Yes."); 76:5-10; 97:25-98:1; Verma Tr. 44:8-10; 77:11-13 ("Q. Did you have any specific hours of work that you worked for Hoyt? A. No."); Yahya Tr. 57:7-22; Matouk Tr. 87:10-12; Reid Tr. 85:4-6.  The variation in drivers' working hours is driven by several fluid factors.  To name a few, customer demand fluctuates seasonally, traffic and weather conditions change hourly, and the number of drivers available and willing to perform trips varies.  Profeta Tr. 25:5-9 ("one week you might get 12 jobs, the next week you might get 25 jobs."); 29:8-10 ("Q. Did the number of hours you worked per week vary from week to week? Q. Oh, yeah, It was never the same."); 80:17-22; Mann Tr. 98:4-9; Lassen Tr. 55:23-56:5; 63:7-64:13; Pierce Tr. 21:14-19; 33:18-22; 47:10-20, excerpts at Ex. 25; Lassen Dec., ¶22; 3/21/14 Lynda S. Dec., ¶10.  The duration of individual trips, even to and from the same locations varies substantially; one day a run from Westchester to Norwalk could take 45 minutes, and another day the same run could take 2 or more hours.  Mann Tr. 139:7-17. Similarly, a run from Stamford to Westport could take 20 minutes one day but take close to 4 hours another day.  *Id*., at 139:18-140:5.  When asked to provide his best estimate of the hours

that he worked, one driver provided a range of under 40 hours to 75 hours per week.  Yahya Tr. 56:25-61:6.

### 3.      Drivers Had Mixed Practices and Beliefs Regarding "Waiting Time"

Drivers' work hours are also impacted by the amount of time that they spend "waiting." Thera are various forms of "waiting time" at issue in this case.  Dkt. 131, p. 13-16; Dkt. 160, p. 1-2.  Sometimes, drivers may wait for customers who are running late.  Lassen Tr. 31:2-14; Profeta Tr. 104:17-105:24.   Other times, drivers may wait at an airport after dropping one customer off because a new customer is scheduled to arrive soon and there is insufficient time between trips for the driver to do as he pleases.  Lassen Tr. 31:2-14; Mauricin Tr. 147:4-148:1. Still other times, drivers use waiting time to bring their assigned vehicles to Hoyt's office, so that other employees can clean them or perform maintenance on them.  Mauricin Tr. 189:2-190:2. Some drivers have testified that certain waiting time required them to stay in proximity to their assigned vehicles and stay in uniform.  Reid Tr. 153:8-154:7; Lassen Tr. 101:2-102:7; Mauricin Tr. 99:10-24.

In contrast, drivers have also testified to enjoying prolonged and often predictable periods of unrestricted down time between trips, during which they were relieved of all work duties and did nothing to benefit Hoyt.   Verma Tr. 101:4-103:13; 111:25-112:5 (4 to 6 hour breaks); Mauricin Tr. 18:11-19:1 (6-plus hour breaks); Reid Tr. 85:25-87:17; 138:7-12; 147:9-150:11 (3-hour breaks); Yahya Tr. 117:1-10; 122:10-20 (between 1 and 3-hour breaks).  Elaborating on the circumstances under which they have extended and foreseeable breaks, drivers testified that it was common for them to have one or two trips in the morning--consistent with normal customer travel patterns--then be completely relieved from duty until some specified point later in the afternoon.  Reid Tr. 85:25-87:17; 138:7-12; 147:9-155:14; Mann Tr. 100:13-16; Yahya Tr. 13:9-16:7; 97:21-98:7; 103:9-12; 119:2-15; Mauricin Tr. 18:11-19:1; 97:7-10; 189:4-190:2; Lassen

Tr. 101:17-102:12; 116:6-117:3; Pierce Tr. 27:7-20; Capone Tr. 36:3-37:25; 62:4-63:13, excerpts at Ex. 26.  Because business and personal travel peak in the early morning and then again in the late afternoon, drivers' trips are often clustered before and after normal business hours, with extended periods of inactivity during the day.  *See id*; *see also* 12/17/13 Santo S. Tr. 25:12-26:15; 32:10-33:8; 3/21/14 Lynda S. Dec. ¶21; Msteka Dec. ¶6.

During their more extended breaks, drivers are unencumbered and free to do as they please.  They may go home, take off their work suits, run errands, visit family, eat, sleep, watch television, and attend to any number of personal matters with no benefit to Hoyt.  Verma Tr. 101:4-103:13; 120:18-21; Mathon Tr.  110:1-13; 120:16-122:3; Mann Tr. 107:19-24; Reid Tr. 150:19-23; 156:9-14; Msteka Dec., ¶6; 3/21/14 Lynda S. Dec., ¶21.  Drivers sometimes use Hoyt's vehicles to attend to personal matters or run errands when they were not working.  Lassen Tr. 86:17-24.  One driver even testified that he used lengthy periods of down time to edit a novel that he was writing.  Profeta Tr. 86:4-23.  The Court has noted that extended and predictable off-duty periods such as these do not qualify as compensable work time.  Dkt. 131, p. 16 fn 4; Dkt. 160, p. 1-2.

### 4.     Drivers Had Mixed Experiences Performing Non-Driving Duties

Drivers have different practices regarding submission of the paperwork (called "Weekly Job Records" and "Trip Tickets") that they fill out and provide to Hoyt in order to get paid. Some drivers submit their Trip Tickets to Hoyt daily, while others submit Trip Tickets less frequently, perhaps once or twice per week.  Lassen Tr. 53:9-54:3 (he submitted no later than Thursday at noon); Dupee Tr. 52:4-21 (he would submit paperwork at least once per week, on Wednesday, but sometimes more frequently if he was "in the office and it was convenient"); Verma Tr. 91:21-92:21 (he would submit paperwork every 2 days); Reid Tr. 137:13-17 (he turned in paperwork after each trip).  The variations in these practices result from the drivers'

preferences, proximity to Hoyt on any given day, and business needs.  Dupee Tr. 52:4-21; Mann Tr. 35:1-36:4.  While most drivers take their assigned vehicles home with them, some of them do not.[4]  Msteka Dec., ¶5 (noting he did not take Hoyt's car home with him); Lassen Tr. 86:13-18 (noting he did take Hoyt's car home with him).

In addition to their primary duty of driving customers, Hoyt drivers also performed limited ancillary duties.  When a driver's assigned vehicle was dirty or required repairs or maintenance, he would bring the vehicle to Hoyt's shop in New Canaan, so that another Hoyt employee could address the vehicle's needs.  Verma Tr. 91:21-92:21: Mauricin Tr. 74:22-78:17; Reid Tr. 92:11-94:22.  Drivers testified that the amount of time that they spent waiting for others to perform these duties varied depending on the vehicle's needs and how busy it was at Hoyt's shop.  Mauricin Tr. 74:22-76:2 (20 minutes to 2 hours).  For example, drivers testified that a car wash could take anywhere between 5 minutes and 2 hours.  Verma Tr. 90:21-24; Mauricin Tr. 74:22-76:2; Reid Tr. 92:11-94:22; Mann Tr. 113:3-123:8.  Some drivers also testified that they had no obligation to wait at the shop for their vehicle to be ready, while others considered it to be a requirement that they wait at the shop.  Mauricin Tr. 74:22-78:18; Reid Tr. 92:11-101:11; Mann Tr. 113:3-123:8; Matouk Tr. 146:18-148:1.  Drivers also ensured that their vehicles were stocked with water and newspapers.  Mauricin Tr. 232:11-20; Reid Tr. 104:3-106:20; Mann Tr. 113:3-123:8.  As with their other duties, drivers testified that it took varying amounts of time to complete these tasks.  Mauricin Tr. 74:22-78:18; Reid Tr. 92:11-101:11; 106:3-20; Mann Tr. 111:5-112:10; 113:3-123:8.

---

[4] Drivers who take their assigned vehicles home have the benefit of avoiding a commute to and from Hoyt's office before and after work, and they do not have to report to Hoyt's office on a daily basis.  3/21/14/ Lynda S. Dec., ¶11.

5.     **Drivers Had Different Experiences Relating to the Time-Keeping Policy Implemented in 2013**

In June 2013, following a U.S. Department of Labor investigation, Hoyt began requiring chauffeurs to record their hours of work.  3/21/14 Lynda S. Dec., ¶¶27-28; Int. Responses No. 17. Specifically, Hoyt added an hours column to the Weekly Job Record document that drivers utilize to record their trips and mileage.  Sample Weekly Job Records.  Mrs. Silvestro testified that since implementing this new timekeeping policy, "there have been no drivers who have claimed overtime."  3/21/14 Lynda S. Dec., ¶28.  More to the point, though, the post-June 2013 Weekly Job Records exchanged during discovery uniformly reflect workweeks of less than 40 hours.  Sample Weekly Job Records.

Some Plaintiffs now claim that Defendants instructed them during private conversations not to record more than 40 hours of work on these records.  Mann Tr. 170:21-172:14; 187:5-7. Other chauffeurs offered contradictory testimony.[5]  Mauricin Tr. 171:4-178:1 (claiming Mr. Silvestro said "try not to make it go over 40"); Profeta Tr. 38:2-5; 40:11-42:14.  Defendants maintain that they gave no such limiting instructions and testified to that effect.  12/19/13 Lynda S. Tr. 25:22-26:17; 11/21/14 Lynda S. Dec., ¶4.

D.     **Defendants' Knowledge Regarding Drivers' Activities and Hours of Work**

Defendants did not know or have reason to know that any particular driver regularly worked more than 40 hours per workweek.  3/21/14 Lynda S. Dec., ¶24; 11/21/14 Lynda S. Dec., ¶¶4-6; 12/17/13 Santo S. Tr. 26:18-22.  Given the amount of down time that drivers experience, Defendants understood that drivers generally work less than 40 hours per week.  3/21/14 Lynda

---

[5] Notably, rather than record hours of work at or near the 40-hour limitation that they allege Defendants mandated, Mr. Lassen and other drivers habitually recorded hours of work in the teens and twenties, never exceeding the low thirties.  Sample Weekly Job Records.  Plaintiffs were unable to cogently explain during their depositions why they would record such low hours if, as they allege, they regularly worked far more than 40 hours per workweek.  Mann Tr. 169:4-188:6.

S. Dec., ¶21; 12/13/17 Santo S. Tr. 26:18-22.  Mr. Silvestro's testimony that he thinks "some" drivers occasionally work overtime is not a concession that he knew or had reason to know that any particular driver regularly worked more than 40 hours per week, much less that he knew or had reason to know that any group of drivers did so.  12/13/17 Santo S. Tr. 26:18-22.  Rather, it reflects his view that the vast majority of drivers do *not* work more than 40 hours per week but it is possible that the busiest drivers may sometimes exceed 40 hours.  *See id.*

Defendants' understanding that drivers generally work less than 40 hours per workweek is supported by the Plaintiffs' dubious allegations regarding their hours of work.  Indeed, in calculating their 40-plus hour workweeks, Plaintiffs credit themselves as working during periods of time that Defendants contend, the Court may find, or a jury may conclude, are not compensable.  Profeta Tr. 35:1-4 ("Q. And would you contend, sir, that napping on the job would be work time for which a driver should be paid. A. Absolutely."); 86:4-92:21 (testifying that he considered everything from his first pick up to his last drop off to be compensable work, regardless of what he did in between, including editing his novel, eating, and vacuuming his house); Mathon Tr. 14:16-18 ("Q. All right. So, you're saying that you're working form the time that you wake up? A. Yeah…"); Reid Tr. 156:9-14 (considering himself working even if sleeping at home); Capone Tr. 36:3-37:25; 62:4-63:13.  Lending further credence to Defendants' understanding, at least a dozen drivers have testified that they "do not believe that [they] have worked more than 40 hours per week" while employed with Hoyt, except for "perhaps some minor exceptions" that they did not report to Hoyt.  Msteka Dec., ¶7; Other Driver Decs., ¶7.

Mr. Lassen and the other opt-in Plaintiffs in this case personally recorded and reported the hours that they claim to have worked since June 2013 on their Weekly Job Records.  Sample Weekly Job Records.  At least as of March 21, 2014, there were "no drivers who have claimed

overtime."  3/21/14 Lynda S. Dec., ¶28.  Likewise, Defendants maintain that "[n]o individual authorized to give instructions to drivers on behalf of Hoyt has instructed any driver not to reflect more than 40 hours of work on his time sheets."  11/21/14 Lynda S. Dec., ¶3.  In view of this factual background, any contention that Hoyt knew or had reason to know that any particular driver was working more than 40 hours per week can only be based of some set of facts specific to that driver.

## III.  ARGUMENT

### A.  The FLSA Collective Action Should Be Decertified

Certification proceedings in putative FLSA collective actions typically are divided into two stages.  At the first stage, courts generally hold plaintiffs to a "lenient standard" of making a "minimal" showing that members of the collective are similarly situated to secure conditional certification.  *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 387 (W.D.N.Y. 2005).  At the second stage, which typically occurs after discovery, courts apply a "stringent standard of proof in determining whether plaintiffs are similarly situated for the purposes of the FLSA."  *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).  Courts make factual findings and examine the evidentiary record to determine whether the opt-in plaintiffs are, in fact, similarly situated.  *Cruz v. Lyn-Rog, Inc.*, 754 F. Supp. 2d 521, 523-24 (S.D.N.Y. 2010).  Unlike the first stage, where plaintiffs need only show a "colorable basis" for their assertion that they are similarly situated to opt-in plaintiffs, in the second phase, a court must examine a variety of factors, including "(i) disparate factual and employment settings of the individual plaintiffs; (ii) defenses available to the defendants which appear to be individual to each plaintiff; and (iii) fairness and procedural considerations counseling for or against collective action treatment."  *Zivali*, 784 F. Supp. 2d at 460 (citations omitted).  "[T]he similarities necessary to maintain a collective action under [the FLSA] must extend beyond the mere facts of job duties and pay

provisions." *Sargent v. HG Staffing*, LLC, 2016 U.S. Dist. LEXIS 39893, *104-109 (D. Nev. March 22, 2016) (quotations omitted).  If a plaintiff fails to prove that he and the opt-in plaintiffs are similarly situated at this stage and under this more onerous burden of proof, decertification is proper.  *Id*.  Here, Plaintiffs cannot meet their burden.

### 1.  Discovery Revealed that Drivers Are Situated Differently Regarding the Central Liability and Damages Issue in this Case--Hours of Work

This is an off-the-clock overtime case.  Plaintiffs claim to have worked unrecorded hours overtime hours for which Defendants did not pay them an overtime premium.  The fully developed record debunks Plaintiffs' theory that Hoyt uniformly required all drivers to regularly work more than 40 hours per week, which served as the basis of the Court's decision to conditionally certify the collective action claims.  Notably, though, the question at this decertification stage is not whether Hoyt had a uniform policy relating to compensation.  Rather, the question is whether Hoyt had a uniform policy that resulted in classwide FLSA violations.  *See Brewer v. GNC*, 2014 U.S. Dist. LEXIS 159380, *54-57 (N.D. Cal. Nov. 14, 2014) (decertification was proper even if employer had misclassified employees because overtime liability question was whether any misclassified employee worked more than 40 hours during a week).  Here, the fundamental question of whether any driver worked more than 40 hours during any week involves individualized inquiries into the varied work experiences of each driver.

### a.  Drivers' Working Schedules Varied from Person-to Person and Day-to-Day

Each Plaintiff testified to working varying hours, and none of them claimed to have worked a regular schedule.  Their hours fluctuated day-by-day and week-by-week based on an array of variables.  Those variables included each driver's own preferences and practices in accepting and rejecting runs, in addition to the number and duration of the runs offered to each driver by Hoyt, which in turn varied based on customer demand and the availability of other

drivers.  Each driver experienced wide variations in the time that it took to perform each run, along with wide variations in time spent performing non-driving duties.  The combination of these variables has resulted in a heterogeneous group of opt-in Plaintiffs.  At best, they can claim that some of them worked overtime during some weeks that they cannot specify or quantify, while working under 40 hours during other weeks, which they also cannot identify.

In addition to the number and duration of each driver's trips, an assessment of any given driver's working hours will require determinations of the nature and quantity of the driver's time between runs.  While some of this so-called "waiting time" may be compensable, much of it is not.  The compensability of that time will differ from driver-to-driver and day-to-day.  The record demonstrates that some of this down time was prolonged, predictable, or prearranged.  During this time, Plaintiffs often did as they pleased, with no benefit to Hoyt.  As the Court has observed, this sort of waiting time is not compensable, and therefore cannot be included in the calculation of Plaintiffs' hours of work.  Dkt. 131, p. 16 fn 4.

How a driver used his down time depends not only upon how much time he had between trips, but also upon his understanding of Hoyt's expectations.  Some Plaintiffs testified that they were free to use that time as they saw fit, without restrictions.  Such time is not compensable.  29 C.F.R. § 785.16 (an employee who is relieved of duties and relatively unrestricted to use the time for "personal purposes" is not performing "work").  Others gave testimony suggesting that they felt restricted during down time, believing that they had to stay in proximity to their vehicles and be ready at a moment's notice, with no freedom to use that time effectively for personal pursuits. There is no means by which the Court can determine in one fell swoop whether all time between trips is properly considered working time because the answer will vary from driver-to-driver, and even for the same driver, may vary from break-to-break.  The governing regulations recognize

-17-

the compensability of waiting time to be a fact-bound inquiry.  *Id.* at § 785.14 ("[f]acts may show that the employee was engaged to wait or they may show that he waited to be engaged."). Without the ability to make a generalized determination regarding the compensability of waiting time, it is impossible to assess any given driver's overall working hours, except by resort to a painstaking review of all of that driver's activities during the period of time in question.  A broader conclusion about the number of hours worked by Hoyt's drivers, in general, is substantially more elusive.

In recent off-the-clock cases like this one--where the ultimate overtime liability question required individualized inquiries--courts have granted motions to decertify.  *See Ruiz v. Winfield*, 93 F. Supp. 3d 279, 295-300 (S.D.N.Y. 2015); *Seward v. IBM, Corp.*, 2012 U.S. Dist. LEXIS 49688, *70-81 (S.D.N.Y. Jan. 20, 2012); *Zivali*, 784 F. Supp. 2d at 464-467.  Decertification in a case like this is the rule, rather than the exception.  *See, e.g., Brewer v. GNC*, 2014 U.S. Dist. LEXIS 159380, *54-57 (N.D. Cal. Nov. 14, 2014) (granting decertification where plaintiffs worked different schedules, requiring individualized inquires to determine whether each plaintiff reached the overtime threshold); *Willoughby v. Youth Villages, Inc.*, 113 F. Supp. 3d 1265, 1274-1276 (N.D. Ga. 2015) (same); *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 631-632 (S.D. Cal. 2014) (granting decertification despite existence of uniform company policy because real issue was whether the policy resulted in unpaid wages, which required individualized inquiries); *Lugo v. Farmers Pride Inc.*, 737 F. Supp. 2d 291, 303-317 (E.D. Pa. 2010) (granting decertification where evidence suggested some uncompensated work time but hours of work inquiry required individualized determinations); *Sargent v. HG Staffing*, LLC, 2016 U.S. Dist. LEXIS 39893, *104-109 (D. Nev. March 22, 2016) (granting decertification given need for individualized determinations regarding number of off-the-clock hours).

Plaintiffs in such cases often argue that hours of work inquiries are mere damages questions that do not preclude class or collective action treatment.  That may be true in exempt status classification cases or cases in which employees' hours of work are not disputed, but it is not true here.  Here, Plaintiffs must prove overtime liability under the FLSA, meaning they must each prove that they worked enough hours to exceed the threshold for entitlement to overtime.  *Brewer*, 2014 U.S. Dist. LEXIS 159380, at \*54-55.  Only if they cross that threshold will the hours of work inquiry pass from a liability question to a damages question.  *Id*. at \*54-55 (stating in an off-the-clock case, "the 40-hour threshold is not only a baseline for damages, but an element of liability").  Framing the hours of work inquiries required in this case as damages inquiries places the "damages cart before the liability horse." *Stiller*, 298 F.R.D. at 631-632.  The substantial variations between drivers in their working hours therefore cannot be eschewed as a mere damages question to be addressed at some later stage of the litigation.

A simple example clarifies this point.  During one week in question, Mr. Lassen filled out and submitted to Hoyt a Weekly Job Record on which he claimed to have worked 18 hours.  *See* Ex. 17.  Assuming that a jury finds credible his claim that Defendants forced him to record less than 40 hours, Mr. Lassen still must prove that he worked more than 40 hours that week to reach the liability threshold for overtime under the FLSA.  Given the modest number of trips that he took that week, he could only make that showing by demonstrating that he incurred substantial compensable "waiting time" during that week.  At the end of that assessment, if the jury concluded that he worked a total of 20 unrecorded work hours, that will bring his total weekly hours to 38, which is still shy of the FLSA's overtime threshold.  Thus, Mr. Lassen will have failed to establish overtime liability for that week.  A similar inquiry will be required for every other driver and every other week at issue in this case.

The Court has several times made reference to the individualized liability questions inherent in each Plaintiff's claims in this case.  In its initial certification order, the Court noted that "[t]here remains considerable dispute . . . as to whether plaintiff or other drivers actually worked more than 40 hours per week and, relatedly, what activities properly constitute work time for which limousine drivers are entitled to be compensated."  Dkt. 43, p. 3-4.  In the same order, the Court stated that "how each driver will prove the amount of damages (if any) to which he is entitled—may well require individualized inquiries."  *Id.*, p. 16 (emphasis added).

More recently, in orders relating to Plaintiffs' motion for summary judgment, the Court shed further light on the need for individualized liability and damages determinations in this case.  In its August 5, 2015 summary judgment order, the Court observed that "some of the drivers worked more than forty hours in a single workweek on some occasions." Dkt. 131, p. 7. During a subsequent conference the Court clarified that Plaintiffs must prove who, if anyone, is actually owed overtime.  8/18/15 Hearing Tr., p. 4-5 ("So what would have to be determined is what any specific person worked at any point in time and what they would be owed, if anything.") (emphasis added), Ex. 27.  The Court has since clarified further, noting that despite the summary judgment order, Plaintiffs must prove: (1) what constitutes compensable work time; (2) who worked more than 40 hours during any given workweek; (3) the particular weeks in which any individual driver exceeded 40 hours of compensable work; and (4) the number of hours beyond 40 that any individual driver worked during any particular week.  Dkt. 160, p. 1-2.

Finally, even if viewed as a damages question, the need for individualized assessments of hours worked further militates in favor of decertification.  *Comcast Corp. v. Behrend,* 596 U.S. __, 133 S.Ct. 1426, 1432-1433 (2013).  While courts have held that individualized damages inquires do not necessarily and strictly *require* decertification in FLSA cases, that does not mean

that such damages inquiries are properly disregarded in assessing a motion to certify or decertify

a class or collective.  To the contrary, individualized questions of damages should be weighed in

favor of decertification because they are contrary to the goal of judicial efficiency that underlies

the FLSA's collective action device.  *See Ruiz v. Citi Bank, N.A.*, 2015 U.S. Dist. LEXIS 34489,

*44 (S.D.N.Y. March 19, 2015) ("the necessity of additional individualized inquiries over

damages, while not inherently fatal to class certification, should be considered at the certification

stage when weighing predominance issues.") (quotations omitted).

### b.  Plaintiffs' Effort to Prove that Hoyt Was Aware of Their Overtime Work Raises Further Individual Questions

Even if Plaintiffs could somehow resort to common proof to show that they worked

overtime hours, they would face further individualized challenges in undertaking to establish that

Hoyt is liable to them for overtime.  A plaintiff who proves that he worked uncompensated

overtime must also prove that the employer had actual or constructive knowledge of the overtime

before he can recover any damages.  *Zivali*, 784 F. Supp. 2d at 467-468.  In this case, the answer

to that question is not susceptible to common proof or resolution in one broad stroke.

Plaintiffs do not claim that they ever reported or complained about working more than 40

hours per week.  Most of them admit to working less than 40 hours per week on at least some

occasions.  Of course, Defendants had no ability to directly observe Plaintiffs working, as might

be the case in an office or factory setting, because the fundamental nature of their job required

them to move between remote locations.  Further, there was no policy or practice requiring

drivers to work more than 40 hours (or any other number of hours) per week.  Drivers were

permitted to, and did, reject or accept the assignments offered to them.  At the same time, the

drivers uniformly submitted Weekly Job Records reflecting workweeks of under 40 hours.

Defendants believed, and continue to believe, that the extended periods between runs did not

amount to compensable work time, making for relatively short working days for most drivers. Finally, a dozen drivers have testified that they regularly worked less than 40 hours per week, except for perhaps on rare occasions that they did not reveal to Defendants.  Exploration of these factors as to each Plaintiff will impact the ultimate determination of whether Defendants had actual or constructive knowledge of any driver's overtime work, if any.  *See Seward*, 2012 U.S. Dist. LEXIS 49688, at *59-60 (decertifying based in part on individualized issues regarding management knowledge of off-the-clock overtime); *Zivali*, 784 F. Supp. 2d at 468 (same); *Sargent*, 2016 U.S. Dist. LEXIS 39893, at *111 ("It is not enough for a plaintiff to establish his employer's knowledge of a few incidents of off-the-clock work for several years' worth of claims.") (quotations omitted).  While Plaintiffs may try to dispute these points to varying degrees, such disputes would merely underscore the individualized nature of the question of whether Defendants "knew or should have known" that any particular Plaintiff was working overtime during any particular week at issue in this case.

### 2.    Collective Treatment Would Be Neither Fair Nor Manageable

Courts have observed that whether procedural and fairness considerations weigh in favor of decertification is largely dependent upon the first two factors in the decertification analysis. *Seward*, 2012 U.S. Dist. LEXIS 49688, *93-94 ("where plaintiffs do not share common factual and employment settings and defenses are individualized, this this third factor weighs against proceeding as a collective action.") (citing *Zivalo*, 748 F. Supp. 2d at 468-469).  As demonstrated above, even if it were within the realm of the possible to proceed to trial with this case on a collective action basis, adjudicating Plaintiffs' overtime claims under the FLSA on a collective basis would be unfair and inefficient.

Plaintiffs freely admit that none of them is in the position to testify about the hours of work of any other driver.  It is also plain that due to the variation in drivers' working schedules,

establishing the number of hours that one Plaintiff worked will provide no useful information about the hours of the next driver in line.  Thus, the only way for Plaintiffs to prove their overtime claims is for each driver to testify regarding his working activities and any facts that may have put Defendants on notice of that driver's working hours.

Despite each Plaintiff's inability to speak to the hours of work of any other driver, Plaintiffs have identified no workable means of trying this case by representative or common proof.  While they initially identified Mr. DeCusati, an accountant, as a proposed expert to testify about drivers' alleged hours of work and overtime wages owed, their proffer of Mr. DeCusati as an expert witness who can offer opinion testimony on these subjects has failed.  Initial DeCusati Disclosure, Ex. 28.  They have failed three times to produce an expert report from Mr. DeCusati, and even if they had produced a report, Mr. DeCusati would be unable to satisfy the requirements to serve as an expert witness under Fed. R. Civ. P. 702.  *See* Dkt. 155, 156, 159.

Individualized mini-trials will be necessary to determine who may have worked more than 40 hours per week, when, to what extent, and with whose knowledge.  There is no way to answer these liability and damages questions using representative proof.  In fact, resolution of the individualized liability and damages questions in this case would be unfair to Defendants because it would deprive them of the opportunity to cross examine each Plaintiff regarding their alleged hours of work claims, waiting time activities, and their contentions regarding Defendants' knowledge of overtime hours.  Defendants must have an opportunity to cross examine each Plaintiff regarding their claims regarding actual trip lengths, sleeping and writing novels while they claim to be on-the-clock, and the *de minimis* nature of non-driving duties, to name a few.  *Mendez v. U.S. Nonwovens Corp.*, 2016 U.S. Dist. LEXIS 43957, *22-29 (E.D.N.Y.) (decertifying overtime claims, stating "Defendants may raise the *de minimis* doctrine

that permits employers to disregard, for purposes of the FLSA**,** otherwise compensable work when the matter in issue concerns only a few seconds or minutes of work") (citations omitted). Of course, each driver testifying would make for an exceptionally laborious trial and would be contrary to the purposes of the collective action device. *Zivalo*, 748 F. Supp. 2d at 469 (stating individualized mini-trials are "the antithesis of collective action treatment"). Thus, fairness and procedural considerations weigh squarely in favor of decertification.

### B. The Rule 23 CMWA Class Action Should Be Decertified

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. __, 131 S.Ct. 2541, 2550 (2011). To invoke this exception, plaintiffs must show that: (1) the class is so numerous that joinder is impracticable; (2) there are questions common to the class; (3) their claims and defenses are typical of the class; and (4) they will fairly and adequately represent the class. Fed. R. Civ. P. 23(a). Even if plaintiffs can meet all of these threshold requirements, they still have the more difficult burden of establishing that common questions predominate over individual ones and that a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b); *Comcast Corp. v. Behrend,* 596 U.S. __, 133 S.Ct. 1426, 1432 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997) ("the predominance criterion is far more demanding" than the commonality criterion). Courts must conduct a "rigorous analysis" of these requirements, and the plaintiffs' failure to satisfy any one of them renders class certification improper. *Wal-Mart,* 131 S.Ct. at 2551. A court should decertify a class action any time before final judgment when changes in circumstances render a class action no longer appropriate. *Stiller*, 298 F.R.D. at 622 ("certification may be altered or amended before final judgment" based on "subsequent developments in the litigation."). In light of the discovery record compiled in

this matter, Plaintiffs' CMWA claims are ill-suited to class action treatment for the same reasons that their federal claims are incompatible with collective action treatment.  This case presents fundamentally individualized issues, and Plaintiffs have identified no viable means to prove their claims through representative evidence.  With no prospect of proving their case in a way that would position them to rise or fall together, Plaintiffs can only proceed separately.

> **1.    Commonality and Predominance Are Lacking Because Liability Hinges on Individualized Proof**

Critical to the requirements of commonality and predominance is the notion that the key issues in the case must be susceptible to common or representative proof.  If a claim cannot be resolved on behalf of an entire class without resort to examination of the circumstances of each class member, decertification is proper.  *Wal-Mart*, 131 S.Ct. at 2551 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.") (quotation omitted).  *Wal-Mart* establishes that commonality requires more than asking whether the defendant violated the law or maintained a uniform policy.  131 S.Ct. at 2551 (stating commonality requirement "is easy to misread, since any competently crafted class complaint literally raises common questions.").  What matters is whether a question will generate a common answer capable of resolving class-wide liability in one stroke.  *Id*; *see also Koike v. Starbucks Corp.*, 2008 U.S. Dist. LEXIS 115164, *19-28 (N.D. Cal. June 20, 2008), *aff'd* 378 Fed. Appx. 659 (2010) (denying certification for lack of predominance because even if employees were uniformly misclassified, they still had to prove that they worked overtime off-the-clock, which could not be done with common proof).  Commonality and predominance are absent from this case.

In the wake of *Wal-Mart*, courts have found class certification improper in off-the-clock overtime cases like this one. *See Ruiz*, 2015 U.S. Dist. LEXIS 34489, at *42-43 (denying class certification in off-the-clock case involving bankers); *Howard v. CVS Caremark Corp.*, 2014 U.S. Dist. LEXIS 172406, *24-51 (C.D. Cal. Dec. 9, 2014) (denying class certification in off-the-clock case involving pharmacists); *Stiller*, 298 F.R.D. at 625-628 (decertifying class in off-the-clock case "because liability hinges on whether employees actually performed [off-the-clock] work."); *Koike*, 2008 U.S. Dist. LEXIS 115164, at *19-28.  For example, in *Ruiz*, the court found the predominance and superiority requirements to be unsatisfied because "whether personal bankers worked unreported overtime, at whose direction, and with whose knowledge" raised "individualized inquiries into liability that confirm[ed] the impracticability of proceeding as a class.  *Id*. at *42-43.  The court in *Ruiz* also noted aptly that the reasoning of cases in which courts have certified classes of employees claiming to be misclassified as exempt from overtime requirements are of no application to off-the-clock cases, in which liability and damages are not susceptible to common proof.  *Id*. *39-42 ("a review of the case law confirm that these 'misclassification' cases are far more susceptible to classwide resolution than 'off-the-clock' case such as the instant one").

In this case, like *Ruiz*, there are no common answers to the liability issues presented, and individualized, person-by-person inquiries would drown any common questions that Plaintiffs might raise.  The now fully developed record evidence leaves little room for debate on this point.  The total number of hours that drivers worked per week varied dramatically based on the number and duration of their trips.  Similarly, some waiting time at issue is compensable, and other waiting time is not compensable.  The particular facts of each period of waiting time, including what each driver did, what he was free to do, and the communications between him and Hoyt,

impact whether or not the time was compensable.  *See* p. 7-12, *supra*.  Whether a driver worked more than 40 hours during one week provides no information as to whether he worked more than 40 hours the preceding or following week.  By the same token, such a showing would do nothing to prove or disprove that any other class member worked more than 40 hours during any week at issue in this case.  More still, there are related liability questions concerning the knowledge, if any, that Defendants had regarding any given class member's alleged overtime hours.   In other words, what predominates here is not any Hoyt policy of treating drivers as exempt or non-exempt from overtime.  What predominates here are individualized inquiries to determine who may or may not have worked overtime, and if so in what amounts, along with questions about Defendants' constructive knowledge of each driver's activities.   Under those circumstances, decertification is proper.  *Velasquez v. Digital Page, Inc*., 303 F.R.D. 435, 441-444 (E.D.N.Y. 2014) (finding commonality and predominance absent where individualized inquiries are necessary to determine hours worked, stating "The fact of common exemption does not establish whether all plaintiffs were *actually* entitled to overtime pay or whether they were covered...") (emphasis in original); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (affirming denial of certification because claims would "require inquiries into how much time each individual spent in or out of the office").  *Koike*, 2008 U.S. Dist. LEXIS 115164, at *19-28.  The Court has acknowledged this aspect of the case several times.  Dkt. 43, p. 3-4, 16; Dkt. 131, p. 16 fn 4; 8/18/15 Hearing Tr., p. 4-5 ("So what would have to be determined is what any specific person worked at any point in time and what they would be owed, if anything.") (emphasis added).

Again, Plaintiffs cannot wish away the individualized liability determinations that permeate this case by simply calling them damages calculations.  Plaintiffs do not and cannot

claim that every driver worked more than 40 hours every week.  To be sure, if it were settled that every driver worked more than 40 hours every week, then the individualized issue would be one of pure damage calculation.  That is not the case, however.  As the Court has stated, who worked more than 40 hours in any given week, if anyone, is an open question.  8/18/15 Hearing Tr., p. 4-5.  Plaintiffs have offered no means of establishing who exceeded 40 hours, or when they did so, utilizing representative proof.

> ### 2.    As the Court Indicated, Individualized Damages Inquires will also Predominate Over Issues Common to the Class

In 2013, the Supreme Court extended its reasoning in *Wal-Mart* when it held that class certification is not permitted where "individual damage calculations will inevitably overwhelm questions common to the class."  *Comcast*, 596 U.S. __, 133 S.Ct. at 1433; *see also Jacob v. Duane Read, Inc.*, 602 Fed. Appx. 3, 7 (2d Cir. 2015) (noting in exempt classification overtime case that, although liability questions were uniform, predominance was absent because of individualized damages inquiries).   *Comcast* is dispositive here, given the inescapable and personalized damages probes that will inevitably predominate over common issues.

Even if Plaintiffs could somehow establish that every class member worked more than 40 hours during at least some week in the statute of limitations period, they would still be left to prove damages.  They would have to prove the number of hours above 40 that every class member worked during each workweek at issue in this case.  It is undisputed, however, that this is an inherently individualized issue.  Plaintiffs do not seriously dispute that individualized damages inquiries are necessary in this case, and the Court has observed that such inquiries are necessary.  Dkt. 43, p. 16 ("how each driver will prove the amount of damages (if any) to which he is entitled—may well require individualized inquiries.")  (emphasis added); 8/18/15 Hearing Tr., p. 4-5.  Given the modest size of the state law class, the burdens of such a proceeding to

examine the individual circumstances of each of a few dozen class members plainly outweigh any advantages, which is why the governing Rule prohibits class treatment absent a showing that the class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(4). Faced with this set of fundamentally individual questions and no explanation of how Plaintiffs might overcome them, the Court should decertify Plaintiffs' state law class action claim.

## <u>CONCLUSION</u>

For all the reasons set forth above, the Court should decertify the conditionally certified collective action under the FLSA and class action under Rule 23.

Respectfully Submitted,

DEFENDANTS, HOYT LIVERY, INC.,
SANTO SILVESTRO, AND LYNDA
SILVESTRO,

By their Attorneys,

*/s/ Anthony S. Califano*
Barry J. Miller (CT Fed. Bar No. 29877)
Anthony S. Califano (CT Fed. Bar No. 27323)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210
Tel:  (617) 946-4800
Fax:  (617) 946-4801
bmiller@seyfarth.com
acalifano@seyfarth.com

Dated:  May 20, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2016, a true copy of the foregoing document was filed electronically through the Court's ECF system, which will deliver electronic notification to all individuals listed as registered participants, and that hardcopies will be delivered to any counsel of record or unrepresented party not listed as a registered participant.

*/s/ Anthony S. Califano*
Anthony S. Califano