## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| ROGER LASSEN, JR., individually and on behalf of all other similarly situated individuals, |
|       Plaintiff, |
| |
|       v. |
| |
| HOYT LIVERY, INC., SANTO SILVESTRO, and LYNDA SILVESTRO, |
|       Defendants. |

No. 13-cv-1529 (VAB)

## RULING ON MOTION TO DECERTIFY FLSA COLLECTIVE ACTION AND RULE 23 CLASS ACTION AND ORDER ON MOTION TO STRIKE

Plaintiff, Roger Lassen, Jr., brings this action against Defendants, Hoyt Livery, Inc. ("Hoyt Livery"), Santo Silvestro, and Lynda Silvestro, asserting claims under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and the Connecticut Minimum Wage Act, Conn. Gen. Stat. §§ 31 to 58 *et seq.* ("CMWA"). ECF No. 134. The Amended Complaint asserts claims under two counts, (1) a collective action claim under 29 U.S.C. § 216(b) for violation of the overtime provisions of the FLSA ("Count One") and (2) a class action claim for violation of the overtime provisions of the CMWA ("Count Two"). ECF No. 134.

On September 17, 2014, the Court (Meyer, J.) granted Plaintiff's motion to conditionally certify a FLSA collective action and to certify a Rule 23 class action. ECF No. 43. On May 15, 2015, this Court (Bolden, J.) denied Defendants' previous motion to exclude Plaintiff's proffered expert witness, Joseph A. DeCusati. ECF No. 114. On August 5, 2015, this Court granted Plaintiff's previous motion for partial summary judgment regarding Defendants' liability under Count One and Count Two. ECF No. 131. Defendants now move to preclude Mr. DeCusati,

from testifying in this case.  ECF No. 155. Defendants also move to decertify the FLSA

collective action and the Rule 23 class action.  ECF No. 161.

For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART**

Defendants' motion to preclude Plaintiff's expert witness, Mr. DeCusati, from testifying in this

case.  The motion to preclude is denied**,** in that Mr. DeCusati may testify as to conclusions in his

expert reports regarding overtime wages Defendants allegedly owe to the nine drivers for which

he analyzed data.  The motion to preclude is granted in that Mr. DeCusati may not testify as to

conclusions regarding overtime wages Defendants allegedly owe to the other 38 drivers in the

class because Plaintiff had access to data for all 47 drivers in the class, but did not use the data

related to the remaining 38 drivers in his expert report.  The Court also **DENIES** Defendants'

motion to decertify the FLSA collective action and the Rule 23 class action.

## I.  BACKGROUND

The underlying factual background of this case is described in further detail in the

Court's previous order granting Plaintiff partial summary judgment.  Summ. J. Order at 2-3, ECF

No. 131.

For nearly three years, Mr. Lassen worked as a limousine driver for Hoyt Livery, a

Connecticut company owned by Mr. Silvestro and Ms. Silvestro.  All drivers employed by Hoyt

Livery, including Mr. Lassen, were paid in accordance with a commission-based system.  Under

the system, a dispatcher assigned drivers to work trips requested by customers, and the assigned

driver earned 40% of whatever fee was charged to the customer for the requested trip.  The 40%

figure included two components: 25% was designated as a "commission," while 15% was

designated as a "built-in gratuity."  Hoyt Livery required full-time drivers to be available six

days a week.

Hoyt Livery also required full-time drivers to perform certain activities for which drivers received no additional compensation beyond the 40% commission per trip. For example, Hoyt Livery provides customers with one "free" hour of wait time for a pick-up at an airport, for which drivers did not receive compensation. Hoyt Livery also did not provide additional compensation for time that drivers spent driving to a pick-up location without a customer in the vehicle. Drivers also were expected to maintain their company vehicle, including by bringing in the vehicle for service, checking its fluids, washing and waxing, taking it to an auto body shop, and so on – all without additional compensation.

Until July 2013, Hoyt Livery did not maintain hourly time records for its drivers. During the period relevant to this lawsuit, Hoyt Livery drivers also did not receive additional compensation if they worked more than forty hours in a week. Regardless of how many hours a driver worked in a week or how many trips a driver took, all drivers earned the same "flat rate" 40% commission per trip. Hoyt Livery has since changed their policy, and now pays drivers one and a half times their weekly commission, if and when the driver works more than forty hours during that workweek.

## A. The Court's Summary Judgment Order Regarding Liability

On August 5, 2015, the Court granted Plaintiff's motion for partial summary judgment regarding Defendants' liability for the claims in Count One and Count Two of the Amended Complaint. ECF No. 131. Specifically, the Court found that there was evidence establishing that there were at least some drivers who worked more than forty hours in a workweek on at least some occasions who were not compensated with overtime pay. Summ. J. Order at 9. As the Second Circuit has recommended that, if a defendant in a FLSA case "failed to compensate [employees] properly for even one hour of overtime, liability is established" and any other issues

"relate[] only to damages," the Court granted partial summary judgment for Plaintiff regarding Defendants' liability under Count One and Count Two. *Estrella v. P.R. Painting Corp.*, 356 F. App'x 495, 497 (2d Cir. 2009) (summary order); *see also* Summ J. Order at 10. As a result, because Count One and Count Two are the only claims remaining in this case, the only issue left for trial, as far as the Court is concerned, is the amount of damages that Defendants owe to the employees who were not properly compensated for overtime. *See* Summ J. Order at 17.

The Court's summary judgment order also explained that, as a matter of law, certain periods of time when Hoyt Livery drivers did not have a passenger in their car were compensable hours under the FLSA and CMWA, which then counted as part of the total for determining whether a driver had worked more than forty hours in a given workweek. Summ J. Order at 10-11. The time that drivers spend traveling to their first passenger pick-up each day (a practice known as "deadheading") was found to be compensable work time. *Id.* at 13. The time that drivers spent waiting between scheduled assignments during the workday was also found to be compensable work time. *Id.* at 16. The time that drivers spent waiting for passengers, even if the passenger cancelled, was also found to be compensable work time. *Id.* at 16-17.

**B.     Proffered Plaintiff Expert Witness Mr. DeCusati**

The pending motion to preclude is only the most recent in a long string of discovery disputes surrounding the timing of disclosures and the content of the potential testimony of Plaintiff's proffered expert witness, Joseph A. DeCusati. Defendants previously moved to exclude Mr. DeCusati as an expert witness on April 17, 2015. ECF No. 106. In an order dated May 15, 2015, the Court denied Defendants' motion. ECF No. 114. As Plaintiffs had yet to file Mr. DeCusati's expert report by that date, the Court's order reserved decision on Defendants'

motion to preclude Mr. DeCusati's testimony under Fed. R. Evid. 702.  Discovery Order at 6 n.2, ECF No. 114.

Defendants now renew their motion to preclude Mr. DeCusati's testimony on two grounds.  ECF No. 155.  First, Defendants allege that Plaintiff's disclosures of Mr. DeCusati as an expert witness have been untimely in three ways.  Def.'s Preclusion Br. at 9-10, ECF No. 155.  Second, Defendants again argue that Mr. DeCusati's testimony should be precluded under Rule 702.  *Id.* at 10-16.

### 1. Timing of Disclosure

#### a. Disclosure of Expert Witness

First, Defendants argue that Plaintiff was untimely in disclosing Mr. DeCusati as an expert witness.  Def.'s Preclusion Br. At 2.  On October 30, 2014, the Court (Meyer, J.) adopted the schedule that the parties proposed, which provided, in relevant part, that expert witnesses and expert reports should be disclosed by January 5, 2015.  Rule 26(f) Report at 2, ECF No. 50; ECF No. 55.  On February 19, 2015, Plaintiff filed a motion, *nunc pro tunc*, for an extension of time until April 6, 2015 to disclose expert witnesses.  ECF No. 97.  Plaintiff's motion noted that, although Plaintiff had been requesting documents since February 26, 2014, Defendants did not produce documents until January 29, 2015, after the parties finally agreed that Defendants would produce documents only for a sample of ten class members. Motion at 1, ECF No. 97.  This Court (Bolden, J.) granted Plaintiff's motion in part, setting a deadline of March 30, 2015 for the disclosure of expert witnesses and expert reports.  ECF No. 99.

#### b. Disclosure of Original Expert Report

Second, Defendants allege that Plaintiff was late in providing an expert report.  Def.'s Preclusion Br. at 2.  After the Court set a deadline of March 30, 2015 for the disclosure of expert

witnesses and expert reports, ECF No. 99, Plaintiff disclosed the identity of Mr. DeCusati as a proposed expert witness by e-mail dated March 30, 2015. Email, ECF No. 155-1. Plaintiff then sent Mr. DeCusati's curriculum vitae, including a list of cases that Mr. DeCusati previously testified in, to Defendants on the morning of March 31, 2015. Email, ECF No. 155-2.

On April 17, 2015, Defendants filed a motion to exclude Mr. DeCusati as an expert for various reasons, including the lack of disclosure of Mr. DeCusati's expert report by that date. ECF No. 106. The Court denied this motion in an order dated May 15, 2015. ECF No. 114. In the order, the Court noted that, although Plaintiffs first requested documents relevant to a potential expert witness's analysis on February 26, 2014, Defendants did not produce the set of 15,894 documents until February 25, 2015. Discovery Order at 2, ECF No. 114. The Court also ordered the parties to meet and confer before submitting a joint proposed modified scheduling order that would set a new deadline for Plaintiff to provide an expert report and deadlines for Defendant to disclose rebuttal experts and for the completion of expert depositions. *Id.* at 6.

In the order, the Court also noted that Plaintiff should have communicated any problems with meeting the expert disclosure deadlines to Defendants sooner, and, were the parties unable to come to an agreement, Plaintiff could have filed a timely motion for extension of time "well in advance of even the original deadline for expert disclosure," which was January 5, 2015. Discovery Order at 7. As a result, the Court ordered that, because of Plaintiff's failures to meet disclosure deadlines, Plaintiffs would be sanctioned under Rule 37(c)(1) by being ordered to pay Defendants' reasonable costs and attorneys' fees regarding the discovery motions, not to exceed $250. *Id.* Following the parties' submission of a proposed modified scheduling order, the Court set a new deadline of June 8, 2015 for Plaintiff to disclose Mr. DeCusati's expert report. ECF No. 118; ECF No. 123.

Plaintiff sent Defendants Mr. DeCusati's expert report, dated June 8, 2015, on June 8, 2015 ("Original Expert Report"). Email, ECF No. 155-3. The Original Expert Report provided a calculation of the estimated amount that Defendants owed to the entire class of 47 Hoyt Livery drivers, based on extrapolations from data and documents relating to nine of the drivers. Expert Report at 2-4, ECF No. 155-3. As of March 2015, in accordance with a stipulation between the parties intended to promote efficiency of discovery, Defendants had only provided documents and data regarding a sample of ten individual class members, which Mr. DeCusati then relied on in preparing the Original Expert Report. Emails, ECF No. 155-6.

Plaintiff also sent Defendants a supplemental expert report, dated August 28, 2015, on September 2, 2015, which also analyzed data for the same nine drivers for which Defendants had produced data ("First Supplemental Expert Report"). Email, ECF No. 155-4. Mr. DeCusati modified the Original Expert Report to account for the Court's summary judgment ruling, which found, in relevant part, that the time that drivers spent driving to their first pick-up of the day was compensable waiting time. Supp. Expert Report at 1, ECF No. 155-4.

### c. Disclosure of Supplemental Expert Report

Third, Defendants allege that Plaintiff has failed to provide a supplemental expert report following the resolution of a dispute regarding the amount of data that Defendants produced to Plaintiff, and whether Mr. DeCusati could properly draw expert conclusions regarding amounts owed to the entire class based on data for only nine or ten drivers. Def.'s Preclusion Br. at 3.

Even before Plaintiff disclosed Mr. DeCusati as their proposed expert witness, the parties had difficulty agreeing on whether the documents that Defendants provided could be representative of the class. *See* Emails, ECF No. 155-6. Defendants' April 17, 2015 motion to

strike also discussed Defendants' contention that Mr. DeCusati could not draw conclusions about the entire class based on data for only a portion of the drivers. Motion at 5, ECF No. 106.

On April 24, 2015, Plaintiff filed a motion to preclude Defendants from contesting the statistical significance of the data set. ECF No. 108. Plaintiffs alleged that Defendants had, when agreeing to produce the documents for only ten of the drivers, stated that this was a "representative sampling" of the class. Motion at 7, ECF No. 108. Defendants' communications with Plaintiff at the time maintained that Defendants produced documents for the sample in the interests of efficiency, but took no position on whether the data for the ten drivers was "a representative sample in the statistical sense." Emails, ECF No. 155-6. Defendants' counsel had, in at least one communication, dated March 23, 2015, indicated that if Plaintiffs were to ask Defendants to produce certain documents for the entire class of drivers, Defendants would object to it as unduly burdensome and on other grounds. Emails, ECF No. 155-10.

On September 4, 2015, the Court addressed the dispute over whether the data for the ten drivers was representative of the class by informing the parties that they should meet and confer to resolve the issue. ECF No. 144. During subsequent discussions, Plaintiffs proposed, among other options, that Defendants produce documents regarding the work done by every collective action and class member. Letters, ECF No. 155-5. Defendants ultimately agreed to produce documents for every driver. Motion at 3, ECF No. 155.

The parties then filed a joint status report on December 30, 2015. ECF No. 148. The Court adopted the deadlines in the status report. ECF No. 149. The parties' report indicated, among other things, that Defendants would produce documents or data for every remaining class member by January 15, 2016. Report at 2, ECF No. 148.

Plaintiff's deadline for filing an additional supplemental expert report, if any, would be March 11, 2016. *Id.* Defendants produced 1,749 documents, representing the requested data for the remaining class members, on or around January 15, 2016. Letter, ECF No. 155-7. To date, Plaintiff has not filed a revised expert report reflecting the new documents and data for the remaining class members, and it appears that he does not intend to file any such report. Pl.'s Preclusion Opp. Br. at 3, ECF No. 156.

### 2. Expert Qualifications

Mr. DeCusati is a certified public accountant. Disclosure at 1, ECF No. 155-1. Mr. Decusati received his Bachelor of Science in Economics from the University of Connecticut in 1991. CV at 1, ECF No. 155-2. He works for a firm that specializes in business valuation, economic damages, and litigation support, and he specializes in the fields of economic damages, commercial litigation, and business valuation. *Id.* at 2. He frequently offers expert testimony in civil cases, in Federal District Court and the State Courts of Connecticut and New Jersey. *Id.* at 1, 4-6. He also frequently testifies in various arbitration proceedings. *Id.*

Mr DeCusati does not, however, have experience with testifying in wage and hour cases. DeCusati Trans. 52:12-22, ECF No. 155-8. He also has not previously testified in any class or collective actions. *Id.* 52:22-53:24. He also has not previously testified to conclusions based on extrapolating data for a sample set of individuals to draw conclusions about a larger population. *Id.* 53:25-54:8.

### 3. Expert Methodology

As Mr. DeCusati explained in the First Supplemental Expert Report, dated August 28, 2015, he drew conclusions regarding the total overtime pay Defendants allegedly owe to the class by relying on data for the sample of nine (9) drivers that Defendants had produced

documents for.  Supp. Expert Report at 1-2, ECF No. 155-4.  Specifically, Mr. DeCusati relied

on "Driver Payment Detail Reports" and driver pay stubs.  Expert Report at 3, ECF No. 155-3.

He revised the Original Expert Report to take into account the Court's order granting partial

summary judgment, ECF No. 131, which had found, in relevant part, that certain types of waiting

time were compensable time.  Supp. Expert Report at 1.

The Driver Payment Detail Reports for each driver, which Hoyt Livery recorded and

maintained, did not include a clear record of the number of hours that each driver worked.  The

Reports for each driver recorded, in relevant part, (a) the date and start time of each trip, but not

the end time; (b) the pick-up and drop-off locations for each trip; (c) the amounts that the

customer paid, including toll and parking expenses; and (d) the amounts that the drivers were

paid for each trip.  *See, e.g.*, Def.'s Decert. Br. Ex. 16, ECF No. 161-16 (showing sample Driver

Payment Detail report); Expert Report at 10 (same).

While the Driver Payment Detail reports also recorded an alleged number for the hours

the driver worked on a given trip, this information was often inaccurate.  *See* Expert Report at 6

(describing adjustments that expert made to take into account how Defendants' system recorded

each driver's time worked as "exactly four hours" by default in certain circumstances and how

records sometimes reflected "clearly excessive or incorrect" hours for certain jobs because of

"input/data error").  Other information in the records, such as the start time for certain trips, was

also known to be inaccurate.  *See id.* at 5 (indicating that the reports recorded many final trips of

the day with a start time of "23:59" or 11:59 P.M. when the trips in fact started past midnight).

Finally, for certain drivers, there "were gaps in the time periods for which Driver Payment Detail

reports were supplied", which Defendants "declined to either explain . . . or provide any further

data to fill these time gaps in."  *Id.* at 4.

Because Defendants' records did not, therefore, include accurate recordings of the number of hours each driver worked, Mr. DeCusati generally performed his own calculations for how many hours each driver worked on a given trip by using driving directions and drive time estimates provided by MapQuest or Google Maps. *See* Expert Report at 5-7. Any entry recorded as "exactly four hours" was because Defendants' system recorded four hours by default, so Mr. DeCusati used MapQuest or Google Maps estimates to calculate the time worked for those trips. *Id.* at 6. Other time estimates in the Driver Payment Details were clearly incorrect, such as when an "excess of 23 hours a day" was recorded, or when single trips were recorded as being "in excess of 6 hours" without notations indicating an extended waiting period. Id. at 6-7. Mr. DeCusati used MapQuest or Google Maps estimates to recalculate the hours associated with those trips, as well as other trips in which he used his own judgment to determine that a time estimate was incorrect. *Id.* at 5-7.

Based on the available data, Mr. DeCusati performed calculations and concluded that the nine drivers for whom he had data were allegedly owed a certain amount in lost overtime wages based on the produced data, then extrapolated that data to draw a conclusion for the entire period relevant to the lawsuit. *Id.* at 2. Mr. DeCusati also extrapolated from the data for the nine drivers to calculate a total amount allegedly owed to the entire class, both for the period for which data was available, as well as for the entire period relevant to the lawsuit. *Id.*

## II. DISCUSSION

### A. Defendants' Motion to Preclude Expert Witness

Defendants' objection to Mr. DeCusati's potential testimony as an expert witness is two-fold. First, Defendants allege that Plaintiff's disclosures surrounding Mr. DeCusati as an expert have been untimely in three different instances. Def.'s Preclusion Br. at 9-10. Second,

Defendants challenge the admissibility of Mr. DeCusati's testimony under Fed. R. Evid. 702, alleging that (a) he is unqualified, (b) his methodology is unreliable, and (c) that his analysis will be unhelpful to the jury. *Id.* at 10-11.

### 1.     Deadlines for Expert Disclosure

Rule 26(a)(2)(B) requires that parties must provide a "written report" to accompany the disclosure of an expert witness. Fed. R. Civ. P. 26(a)(2)(B). Such expert reports must contain, among other things, a "complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). Under Rule 26(a)(2)(E), "[t]he parties must supplement these disclosures when required under Rule 26(e). Fed. R. Civ. P. 26(a)(2)(E). Rule 26(e) requires that a party making disclosures under Rule 26(a) "must supplement or correct its disclosure or response" in "a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1).

Furthermore, parties who disclose expert reports under Rule 26(a)(2)(B) have a "duty to supplement" that extends "to information included in the report," and "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Rule 37 provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

As an initial matter, the Court notes that the previous discovery order in this case, ECF No. 114, already addressed the first two delays that Defendants allege: (1) Plaintiff's failure to disclose an expert witness by the original January 5, 2015 deadline before filing a motion for

extension of time *nunc pro tunc* on February 19, 2015 and (2) Plaintiff's failure to disclose the expert report in advance of the March 30, 2015 deadline this Court set in response to that *nunc pro tunc* motion. The Court utilized its discretion under Rule 37(c)(1) and found that the "appropriate sanctions" for these delays was the imposition of Defendants' costs and fees in bringing their motion, not to exceed $250. Fed. R. Civ. P. 37(c)(1); Discovery Order at 7. In that order, the Court analyzed the *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955 (2d Cir. 1997) factors and found that these two instances of delay did not warrant harsher sanctions or preclusion of Mr. DeCusati as an expert witness. Discovery Order at 4-7.

Defendants now allege a third delay, the failure of Plaintiff to provide an additional supplemental expert report during the time period between Defendants' production of documents for the remaining drivers in the class, on January 15, 2016, and the March 11, 2016 deadline the parties agreed to for the production of supplemental expert reports. Def.'s Preclusion Br. at 4. In Defendants' view, this delay warrants the preclusion of Mr. DeCusati's entire testimony. Plaintiff, for his part, argues that (1) the deadline was permissive and (2) that because Mr. DeCusati will no longer need to extrapolate data from a sample of drivers to calculate potential lost overtime wages for the entire class, he had no intention of filing any additional supplemental expert report at all. Pl.'s Preclusion Oppos. Br. at 3.

Because Plaintiff has already fulfilled his obligation to provide a written expert report under Rule 26(a)(2)(B), Plaintiff's declining to provide an additional supplemental expert report following the Defendants' production of new documents is not in itself a violation of Rule 26. As a result, there is no need for the Court to consider whether sanctions under Rule 37 are appropriate at this time.

However, as explained further below with respect to the analysis under Rule 702 of the Federal Rules of Evidence and Mr. DeCusati's methodology, although Plaintiff's failure to provide a supplemental expert report does not warrant the preclusion of Mr. DeCusati's testimony in its entirety, the Court will limit Mr. DeCusati to testifying only about lost overtime wages that Defendants allegedly owe to the nine drivers whose Driver Payment Detail Reports data he analyzed. Mr. DeCusati may not testify as to his extrapolated conclusions regarding the lost overtime wages that Defendants allegedly owe to the remaining 38 drivers in the class.

### 2. Rule 702 Analysis

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), courts have a gatekeeping obligation to ensure that expert testimony presented to juries is reliable and relevant. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert*, 509 U.S. at 597 (1993); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). Under Federal Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In short, the expert's testimony must be relevant, reliable, and have a factual basis. "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of N.Y.*, 414 F.3d 381, 395 (2d Cir. 2005). "Disputes as to the strength of [a proposed expert witness's] credentials, faults in his . . . methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

### a. Mr. DeCusati's Qualifications

Defendants argue that, while Mr. DeCusati is a CPA who "may be competent in his field," "he lacks credentials relevant to this particular case." Def.'s Preclusion Br. at 4. Mr. DeCusati's previous experiences testifying as an expert witness involve business valuation and valuing property in divorce cases and commercial disputes, and he does not have prior experience with wage and hour cases or class actions. Defendants therefore allege that Mr. DeCusati's experience and qualifications are entirely irrelevant to testimony and conclusions calculating lost overtime wages. The Court disagrees.

A witness need not have credentials, education, or experience that relates specifically to the narrow issue at hand in a particular case in order to be qualified as an expert. *See McCullock*, 61 F.3d at 1043 (affirming admission of engineer's expert testimony despite defendants' arguing that the engineer lack of specific training regarding "fume dispersal and air quality studies" or "lack of knowledge regarding the chemical constituents of the fumes or the glue's vapor concentration level"). In *McCullock*, the witness's general "background and practical experience" as an engineer, *Id.*, was sufficient to meet Rule 702's requirement that an expert witness possess "scientific, technical or other specialized knowledge" that could assist the jury. Fed. R. Evid. 702(a).

Indeed, "[a]n expert who has the requisite minimal education and experience in the relevant field is not barred from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Soliman v. Daimler AG*, No. CV 10-408 (SJF) (AKT), 2011 WL 6945707, at *4 (E.D.N.Y. Aug. 8, 2011), *adopted by*, 2011 WL 4594313 (E.D.N.Y. Sept. 30, 2011). Defendants' allegations about the witness's alleged lack of prior experience with or knowledge of the very narrow issues at hand can be "properly explored on

cross examination" and go to the "testimony's weight and credibility – not its admissibility." *McCullock*, 61 F.3d at 1043.

As a result, because of Mr. DeCusati's status and extensive experience as a CPA, someone who is amply experienced with testifying as to business valuation and the valuation of property, Plaintiff has demonstrated that Mr. DeCusati has the background and practical experience demonstrating that he has "technical or other specialized knowledge" that could assist the jury. Fed. R. Evid. 702(a).

### b.     Mr. DeCusati's Methodology

Defendants also question Mr. DeCusati's methodology for three reasons: (1) that the "Driver Payment Details" or payroll records that Defendants produced to Plaintiff, and that Mr. DeCusati therefore relied on, contained inaccurate information regarding hours; (2) that Mr. DeCusati's analysis relied on an assumption that each driver's daily compensable time ran nonstop from 15 minutes before the first pick-up of the day until the driver dropped off the last customer of the day; and (3) that because the payroll data identified only pick up times and not drop off times, Mr. DeCusati relied on travel time estimates generated from Google Maps and MapQuest as part of his calculations. Def.'s Preclusion Br. at 5-6. The Court finds that these arguments do not warrant the preclusion of Mr. DeCusati's testimony under Rule 702.

The Second Circuit has held that disputes as to alleged faults in an expert's choice of methodology or "lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock*, 61 F.3d at 1044. A trial court should "exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (internal quotation marks omitted). Otherwise, "[o]ther contentions

that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* at 214. Allegations that the factual basis for an expert's testimony are flawed or imperfect "may diminish the probative value" of the expert testimony, but do not demand preclusion. *Id.* (affirming district court's admission of expert testimony despite other party's claim that expert did not examine collapsed bulkhead until nearly three years after accident at issue, "performed no engineering calculations, and provided nothing approaching an informed opinion based upon engineering principles").

In this case, the nature of the evidence available presents many challenges to Plaintiff as he seeks to demonstrate damages in the form of the overtime wages allegedly owed to him and the class. These challenges, however, arise solely from Defendants' poor recordkeeping. As the Court noted in its previous discovery order, it is undisputed that Defendants did not maintain hourly time records for its drivers until July 2013. Discovery Order at 5; *see also* Summ J. Order at 3 (describing Defendants' records including daily trip tickets, weekly trip logs including mileage of each trip, and computer software system for Driver Payment Detail, none of which recorded hours until July 2013). The many shortcomings and flaws of the Driver Payment Detail Reports that Defendants maintained, which served as the basis for Mr. DeCusati's expert report, in addition to some of the steps that Mr. DeCusati took to work around those deficiencies in Defendants' records, are described in Section I.B.3 *supra*. Calculating overtime wages that Defendants owe to Plaintiff therefore requires any expert witness, or even the jury as fact-finder, to draw inferences, make assumptions, and extrapolate from the incomplete data that is available, as well as take steps to account for the flaws and gaps in the data.

The Court therefore rejects Defendants' argument that Mr. DeCusati's methodology was unreliable because of the inaccurate hours data that the Driver Payment Detail Reports contained.

First, Mr. DeCusati's methodology accounted for Defendants' flawed recordkeeping and specifically rejected most of the hours data at issue, opting to recalculate it based on MapQuest or Google Maps driving direction and drive time data. *See* Expert Report at 5-7 (describing how the expert recalculated various types of hours data that was known to be inaccurate). Second, given all of the flaws and gaps in Defendants' record-keeping, described in Section I.B.3 *supra*, any method of determining the hours that Hoyt Livery's drivers worked would require drawing certain inferences and using methods that may be imperfect. As the evidence in this case includes mainly the dates, the pick-up times,[1] and pick-up and drop-off locations for each trip, there are serious challenges to calculating the amount of time each trip took at the specific date and time when the trip occurred.

The Supreme Court has noted that, in FLSA cases, "[d]ue regard must be given to the fact that it is the employer who has the duty . . . to keep proper records of wages, [and] hours." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).[2] "[W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises," to which the solution is, at the very least, "not to penalize the employee." *Id.* While the Supreme Court did not discuss this problem in the context of

---

[1] Certain pick-up times in the Driver Payment Details are also known to be inaccurate. *See* Expert Report at 5 (explaining that an incorrect pick-up time of 23:59 was used for certain trips beginning after midnight).

[2] During the motion hearing for these motions, which was held on November 30, 2016, Defendants argued that *Anderson* merely sets up a burden-shifting framework for proving damages. While Defendants are correct, that burden-shifting framework is most relevant to the stage where the jury will calculate damages and does not necessarily mean that Defendants' evidence will overcome Plaintiffs' prima facie estimate of damages. *See Harold Levinson Associates, Inc. v. Chao*, 37 F. App'x 19, 20-21 (2d Cir. 2002) (summary order) (applying *Anderson* burden-shifting framework to case where district court awarded damages following bench trial and concluding that district court "reasonably chose to discredit the attempts by the employer to utilize its own records to prove hours worked" in cases where employer's pay stub records had gaps and did not record hours worked). The Court also notes that, as Defendants kept no accurate and reliable record of the hours that Hoyt Livery drivers worked, and as Defendants themselves argue that the Driver Payment Details provide a weak and imperfect basis for analyzing the hours worked, Defendants will also encounter considerable challenges in meeting their burden under the *Anderson* framework, to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88.

evaluating an expert witness's methodology, clearly, a FLSA plaintiff should not be penalized for problems that arise solely from the Defendants' recordkeeping.

The Court also rejects Defendants' claim that Mr. DeCusati's methodology was unreliable because of his assumption that each driver's daily compensable time ran nonstop from 15 minutes before the first pick-up of the day until the driver dropped off the last customer of the day. In light of the Court's summary judgment order, which held, in relevant part, that the time that drivers spent traveling to their first pick-up each day, the time that drivers spent waiting between scheduled assignments during the workday, and the time that drivers spent waiting for passengers, including those who cancelled, were all compensable time, Summ. J. Order at 13, 16-17, this assumption that Defendants challenge is not inherently flawed.

Defendants' argument regarding the flaws with Mr. DeCusati's reliance on Mapquest and Google Maps driving directions and drive time data are, however, well taken. *See* Def.'s Preclusion Br. at 13-15. As Defendants noted, even the cases that Plaintiff cites in support of the proposition that courts sometimes take judicial notice of drive times based on such information express concerns about its credibility. *See In re Marriage of Raskob*, No. 67923-6-I, 2012 Wash. App. LEXIS 2768, at *9 (Ct. App. Dec. 3, 2012) ("Computer generated [drive time] information was problematical insofar as much of it did not appear to contemplate actual driving conditions."). The Court has serious concerns regarding the reliability of the Mapquest and Google Maps data that Mr. DeCusati used because such online services cannot calculate driving times that take into account actual real-time road conditions and the many other factors that affect how long a trip can take on any specific, given day.

Nonetheless, with the flawed and limited records that Defendants kept, which provide some viable basis for calculating the drivers' hours worked, any calculation of drive times would

require drawing imperfect inferences about driving times. While Defendants stated at oral argument that a "labor economist" or some other similar expert may offer more reliable estimates than Mr. DeCusati, given the absence of actual and contemporaneously maintained driving time records, any methodology used would be challenged in terms of fully and accurately taking into account the myriad conditions, such as "changes in roadways, construction, weather, route options, or different drive speeds" that can affect driving time at any given day and time. Def.'s Preclusion Br. at 13.

Keeping in mind the principle of *Anderson*, that FLSA plaintiffs should not be penalized for their employers' poor recordkeeping as to hours and wages, the Court finds that Mr. DeCusati's reliance on MapQuest and Google Maps does not warrant the preclusion of his testimony. *See Anderson*, 328 U.S. at 687-88. This question instead goes "to the weight, not the admissibility, of his testimony." *McCullock*, 61 F.3d at 1044. After all, "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony. . . . vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 596).

Finally, the Court notes that Defendants have now, as of January 15, 2016, produced data for all 47 drivers in the class, and Plaintiff did not provide an additional subsequent expert report for Mr. DeCusati after that date. *See* Letter, ECF No. 155-7 (discussing January 15, 2016 production). Thus, Mr. DeCusati's most recent expert report contains conclusions regarding alleged lost overtime wages for the entire class of 47 based on data for only nine drivers. Supp. Expert Report at 2.

As part of the evaluation of an expert witness under *Daubert* and Rule 702, "the district court should undertake a rigorous examination of the facts on which the expert relies" and "the method by which the expert draws an opinion from those facts." *Amorgianos*, 303 F.3d at 267. The Court should "only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* In light of how Plaintiff ultimately received data for all 47 drivers, the original data for only nine drivers cannot serve as "good grounds" for Mr. DeCusati to draw conclusions regarding the lost overtime wages Defendants allegedly owe to the remaining 38 drivers. *Id.* Thus, while Mr. DeCusati may testify as to his conclusions regarding lost overtime wages for the nine drivers whose data he analyzed to produce his expert report, he may not testify as to conclusions regarding lost overtime wages for the remaining 38 drivers in the class.

### c.     Helpfulness to the Jury

Defendants also argue that Mr. DeCusati's testimony should be precluded because it would not be helpful to the jury and could usurp the jury's role. Def.'s Preclusion Br. At 15-16. The Court finds that Mr. DeCusati's proposed expert testimony is admissible because it will likely be helpful to the jury in calculating damages.

When the Court inquires as to whether a proposed expert witness's testimony "will assist the trier of fact," the Court should only preclude "expert testimony that usurps either" one of (a) "the role of the trial judge in instructing the jury as to the applicable law" or (b) "the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (internal quotation marks omitted). Testimony that usurps either the role of the judge or the role of the jury should be precluded because it "does not aid the jury in making a decision," but "undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."

*Id.*; *see also DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (explaining that expert testimony may not testify "based on their personal view of the veracity of a lay witness's testimony" or to legal conclusions such as whether certain actions "amounted to extortion").

Furthermore, "[t]estimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). Thus, a court may also preclude expert testimony if an "untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from" the proposed expert. *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993). Expert testimony may, however, be "admissible where it 'synthesizes' or 'summarizes' data in a manner that 'streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016). While expert testimony "should not merely reiterate arguments based on inferences that can be drawn by laypersons . . . [f]reely admitted is expert testimony that is likely to substantially assist the average person in understanding the case – even if it simply explains facts and evidence already in the record." *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 283 (E.D.N.Y. 2007).

The Court finds that, insofar as Plaintiff presents Mr. DeCusati's proposed expert testimony to assist in calculating damages, his testimony is likely to be helpful to the jury. Although Defendants argue that "[a]ny layman with wifi internet access and a copy of Microsoft Excel" could have performed Mr. DeCusati's analysis, Def.'s Preclusion Br. At 16, an expert's testimony may still be helpful to the jury by summarizing and synthesizing data to "streamline[]" its presentation and "sav[e] the jury time." *Scott*, 315 F.R.D. at 45. Mr. DeCusati's testimony

will not usurp the jury's role and will likely assist the jury in the calculation of damages for the nine drivers whose data he analyzed in preparing his expert reports.

## A. Defendant's Motion to Decertify the FLSA Collective Action

Defendants now move to decertify the FLSA collective action. ECF No. 161. Defendants argue that Plaintiff cannot prove that he and the opt-in Plaintiffs are similarly situated because (a) Defendants allege that not all drivers regularly worked over 40 hours a week, which is an individualized question, Def.'s Decert. Br. at 16, 20, ECF No. 161, and (b) Defendants also allege that the question of whether Defendants were aware of each driver's alleged overtime work is also individualized, *Id.* at 21-22.[3] Finally, Defendants also argue the FLSA overtime claims on a collective action basis would be inefficient. *Id.* at 22-23.

The Second Circuit has not squarely considered the issue of how district courts should analyze motions to decertify FLSA collective actions, though it has endorsed the "two-step

---

[3] Defendants argue, in their briefs and at oral argument, that, despite the Court's earlier summary judgment order in favor of Plaintiff, they may not be liable under the FLSA or CMWA because there is no proof that any Hoyt Livery driver worked over 40 hours a week. If there were undisputable records showing that no driver could have or did work over 40 hours a week, then Defendant's position could have merit. It is, however, undisputed that Defendants did not keep any form of reliable record of the hours that their drivers worked during the time period relevant to this suit. Defendants themselves describe the many challenges to calculating the hours worked by the drivers throughout their briefing of the current motion to preclude Plaintiff's expert witness, challenges that arose almost entirely out of the Defendants' limited record-keeping. The fundamental problem with Defendant's position is that they failed to keep accurate and reliable records of the hours that employees worked. A failure by employers to keep accurate time records may complicate addressing issues of FLSA liability, but they do not absolve the employer of sanction under the law. *See* 29 U.S.C. § 211(c) (requiring employers to "make, keep, and preserve" records of employees' "wages" and "hours"); *see also Anderson*, 328 U.S. at 687-88 (explaining that where an "employer's records are inaccurate or inadequate" the FLSA plaintiff should not be penalized "by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work" and a burden shifting framework that allows the employee to initially show the "amount and extent" of his work as a "matter of just and reasonable inference," which the employer must then disprove, is appropriate); *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 363-64 (2d Cir. 2011) ("In sum, we hold that because [plaintiff] has presented evidence indicating that his employer's records are inaccurate. . . the district court should have afforded [plaintiff] the benefit of *Anderson's* 'just and reasonable inference' standard. A contrary conclusion would undermine the remedial goals of the FLSA.") (internal citations omitted). While an employer may still refute a plaintiff's showing of uncompensated overtime work by such "just and reasonable," though imprecise, inference, the employer must do so by "com[ing] forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence," which will necessarily be challenging if the defendant employer kept no reliable records and has no evidence from which a fact-finder could definitively and reliably conclude that the inference drawn from employee's evidence is unreasonable. *Anderson*, 328 U.S. at 687-88.

process for certifying FLSA collective actions" that most district courts in this Circuit use. *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016) ("In *Myers*, we endorsed a two-step process for certifying FLSA collective actions."); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010) ("[T]he district courts of this Circuit appear to have coalesced around a two-step method, a method which, while again not required by the terms of FLSA or the Supreme Court's cases, we think is sensible.").

Under step one, the conditional certification step, "the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law." *Glatt*, 811 F.3d at 540. "At step two, with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs." *Id.* The second step typically occurs in relation to the defendant's motion for decertification and it involves more "stringent" analysis "upon a full record," to determine "whether the additional plaintiffs are similarly situated" to the named plaintiff. *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 639 (S.D.N.Y. 2013); *see also Cohen v. Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 327 (S.D.N.Y. 2010) ("After discovery, typically on the defendant's motion for decertification, courts engage in the second phase of analysis.").

When considering a defendants' motion to decertify a FLSA collective action at step two, district courts typically consider whether there are "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against collective action treatment." *Morano v. Intercontinental Capital Grp.*, Inc., No. 10-CV-02192 (KBF),

2012 WL 2952893, at *5 (S.D.N.Y. July 17, 2012) (internal quotation marks omitted). The

named plaintiff "bears the burden of proving that the other employees are similarly situated."

*Indergit*, 293 F.R.D. at 639 (internal quotation marks omitted). At the second stage, "[a]ll that is

required is a persuasive showing that the original and opt-in plaintiffs were common victims of a

FLSA violation pursuant to a systematically-applied company policy or practice such that there

exist common questions of law and fact that justify representational litigation." *Pefanis v.

Westway Diner, Inc.*, No. 08-CIV-002 (DLC), 2010 WL 3564426, at *4 (S.D.N.Y. Sept. 7,

2010).

### 1.    Disparate Factual and Employment Settings

Defendants first allege that there are "disparate factual and employment settings of the

individual plaintiffs" because the question of whether each plaintiff worked overtime hours and

how much is an individualized one. *Morano*, 2012 WL 2952893 at*5. Courts have specifically

found, however, that "[t]he existence of individual differences in number of hours worked . . .

will not warrant decertification, as long as Plaintiffs show they are subject to a single decision,

policy, or plan." *Alonso v. Uncle Jack's Steakhouse, Inc.*, No. 08-CIV-7813 (DAB), 2011 WL

4389636, at *3 (S.D.N.Y. Sept. 21, 2011) (denying motion to decertify FLSA collective action

where plaintiffs challenged company-wide policies even if individual plaintiffs worked different

hours, had different schedules, or differing degrees of "diligence in the use of the timekeeping

system"); *see also Ayers v. SGS Control Servs., Inc.*, No. 03-CIV-9078 (RMB), 2007 WL

646326, at *5 (S.D.N.Y. Feb. 27, 2007) (declining to decertify FLSA collective action because

claims were based on defendants' "common practice or scheme" despite defendants alleging that

plaintiffs experienced their job duties differently and that "individualized inquiry is required into

each plaintiff's actual hours of work").

As this Court found on summary judgment, all Hoyt Livery drivers were subject to the same policies and practices, including the lack of overtime compensation for drivers that worked more than 40 hours a week and Defendants' failure to compensate drivers for time spent traveling to the first passenger pick-up of the day or time spent waiting between scheduled assignments. Summ J. Order at 6, 11. Because Plaintiff's FLSA claims are based on Defendants' common practice and policies, decertification is not warranted on the basis of individual plaintiffs allegedly working different amounts of overtime.

Defendants cite to multiple cases and argue that decertification is the norm in most cases similar to this one. *See* Def.'s Decert. Br. at 18. Many of these cases are, however, inapposite. In the cited district court cases from this Circuit, each of the courts specifically found that defendant employers had FLSA-compliant policies and practices providing for both (a) the accurate recording of employees' hours worked, including overtime hours, and (b) that plaintiff employees who worked overtime would receive time and a half overtime pay. *See Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 284 (S.D.N.Y. 2015) ("Citibank's 2009 employee handbook contains several explicit instructions to employees that they are entitled to time-and-a-half overtime pay for hours worked beyond 40 hours. . . . Personal bankers' hours are tracked through Citibank's North America Time & Attendance ('NATA') system."); *Seward v. IBM*, 08-CV-3976 (VB) (PED), 2012 U.S. Dist. LEXIS 49688, at *8-*11 (S.D.N.Y. Jan. 20, 2012), *adopted by*, 2012 WL 860363 (S.D.N.Y. Mar. 9, 2012) (explaining IBM's eTotals timekeeping system that recorded employee hours with the ability to enter overtime and that IBM's formal policies required that employees be compensated for overtime work including time spent logging into computers before formal start of each shift); *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2011) ("As an initial matter, it is clear that both the MyTime system itself

and Mobility's related policies are lawful . . . Mobility's formal policies regarding timekeeping and overtime are likewise legally acceptable. It is undisputed that Mobility maintains official corporate policies that, on the one hand, prohibit working off-the-clock without pre-approval, but, on the other hand, mandate that all overtime, even if not authorized in advance, be paid.").

In contrast, Defendants here neither recorded drivers' hours worked nor paid out any overtime, regardless of how many hours any of their employees worked at the times relevant to this suit. This Court therefore granted summary judgment to Plaintiffs, finding that Defendants' practices left them liable under the FLSA, as a matter of law. Summ. J. Order at 6.

Because the defendants in the cited cases did not have uniform policies or practices that failed to be FLSA-compliant, the question of liability rested on whether their legal policies were applied to different individuals in an illegal manner. *See, e.g.*, *Ruiz*, 93 F. Supp. 3d at 299-300 (finding that plaintiffs had "not shown a common policy that operated to common effect" and could only point to anecdotes regarding how different managers applied policies improperly). As plaintiffs in those cases typically worked for different teams and/or different managers with different expectations, liability was then an individualized question of how the policies were applied to each plaintiff. *See, e.g.*, *Seward v. IBM,* 2012 U.S. Dist. LEXIS 49688 at *80-*81 (concluding that in absence of "sufficiently uniform and pervasive policy requiring off-the-clock work" the fact that different plaintiffs experienced "many differences in specific job duties, team functions and structures, managerial expectations, and individual experiences and understandings" required decertification).

### 2. Defenses Available to Defendants that are Individual to each Plaintiff

Defendants further allege that they may be able to rely on defenses that are individual to each plaintiff. Specifically, Defendants argue that they can raise an actual or constructive

knowledge defense that would be individual to each plaintiff. Where plaintiff employees have been able to show that they were subject to a common policy or plan, "[t]o the extent that Defendants allege an actual or constructive knowledge defense, it is unlikely to vary between individual Plaintiffs." *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 368 (S.D.N.Y. 2014) (discussing case where plaintiffs argued that they were all required to sign in at 8:00, sign out at 4:30, and record a half-hour break for lunch despite actually doing additional work off the clock and often not being able to take the lunch break); *see also Zivali*, 784 F. Supp. 3d at 468 ("In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation."). Because plaintiffs here are challenging Defendants' uniform policies or practices, even if Defendants intend to rely on an actual or constructive knowledge defense, there is no need for decertification.

On the potential defenses that Defendants claim will require individualized proof, Defendants reiterate the argument that different plaintiffs worked different hours, and that not all of them regularly worked overtime. Such "defenses would appear to go largely to the issue of damages, since plaintiffs allege that defendants have maintained and applied certain uniform, across-the-board policies that violate the FLSA." *Mendez v. Radec Corp.*, 232 F.R.D. 78, 92-93 (W.D.N.Y. 2005) (granting plaintiffs class certification and denying defendants' motion to decertify FLSA collective action). As this Court noted in its summary judgment order in favor of plaintiffs on the issue of liability, "[t]he amount of damages owed" is the main question that remains. Summ J. Order at 17. Even if there may be "'individual' issues" with respect to damages for individual plaintiffs in cases concerning a defendant employer's uniform polices,

"[t]hat alone does not mean that a class should not be certified." *Mendez v. Radec Corp.*, 232 F.R.D. at 92-93.

### 3. Fairness and Procedural Reasons

Finally, Defendants argue that this collective action should be decertified for fairness and procedural reasons. This third factor of the FLSA decertification analysis often "depend[s] on the Court's analysis under the first two factors," and if the Court has already found that "the plaintiffs share common factual and employment settings and that defenses are not individualized, then fairness and procedural considerations weigh in favor of certification." *Seward v. IBM*, 2012 U.S. Dist. LEXIS 49688, at *93. "Certification is favored where a collective action would lower costs to the Plaintiffs by pooling resources, efficiently resolving common issues of law and fact, and coherently managing the class in a manner that will not prejudice any party." *Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672 (NGG) (MDG), 2012 WL 686860, at *6 (E.D.N.Y. Mar. 2, 2012), *aff'd*, 594 F. App'x 714 (2d Cir. 2014).

Decertification of a FLSA collective action is therefore inappropriate where, as here, plaintiffs' claims center on common issues of law or fact regarding defendants' uniform practices and policies. Defendants claim that they will be prejudiced by allowing collective treatment, alleging that liability questions require individualized proof. This argument ignores, however, the Court's earlier ruling granting summary judgment in favor of plaintiffs regarding liability, which has already held that Defendants are liable, based on their uniform policies and practices, to any plaintiffs who worked more than 40 hours a week. Summ. J. Order at 17-18.

Furthermore, for many of the individual plaintiffs in this case, the amount of damages is likely to be small, with many plaintiffs likely entitled to around $2,000 or less in lost overtime wages. *See* Supp. Expert Report at 2-6 (calculating that for sample of nine drivers for whom

defendants initially produced data five individuals were likely entitled to $2,012.77 or less). This factor weighs in favor of a collective action being the most efficient way to "adjudicate these small claims in a cost-effective manner." *Gayle*, 2012 WL 686860 at *6 (noting that "at least twenty-one of the opt-in Plaintiffs seek an award of less than $5,000").

**B.      Defendant's Motion to Decertify the Rule 23 Class Action**

The Court certified a Rule 23(b)(3) class to address the CMWA claims. Certif. Order at 13, ECF No. 43. Defendants now move to decertify the Rule 23 class. ECF No. 161. Defendants' arguments in support of decertifying the Rule 23 class essentially repeat their arguments in favor of decertifying the FLSA collective action. The Defendants reiterate their claim that (a) liability in this case requires individualized proof because some class members may not have worked overtime and (b) the question of damages also requires individualized proof because different drivers worked different hours. As discussed above when addressing these arguments in context of the motion to decertify the class action, these arguments do not justify decertification.

**1.      Standard of Review**

"Once a class is certified, Rule 23 provides district courts with broad authority at various stages in the litigation to revisit class certification determinations and to redefine or decertify classes as appropriate." *Jacob v. Duane Reade, Inc.*, No. 11-CV-0160 (JPO), 2016 WL 3221148, at *1 (S.D.N.Y. June 9, 2016) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.") "[A] district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met." *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982).

A court may not, however, decertify a class and "disturb its prior findings absent some significant intervening event or a showing of compelling reasons to reexamine the question." *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015), *aff'd*, 829 F.3d 260 (2d Cir. 2016). Such compelling reasons warranting decertification may "include an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012), *aff'd* 555 F. App'x 37 (2d Cir. 2014). Absent such a showing, "the factual underpinnings of a court's prior certification order are deemed to be the law of the case." *Stinson v. City of N.Y.*, No. 10 CIV. 4228 RWS, 2014 WL 4742231, at *2 (S.D.N.Y. Sept. 23, 2014) (internal quotation marks omitted).

"Courts also consider the progression of the litigation before decertifying a class, to avoid prejudice to class members," in addition to considering "whether a less draconian step like limiting the scope of the class might suffice." *Jacob*, 2016 WL 3221148 at 1 (internal quotation marks omitted); *see also Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984) (finding abuse of discretion when district court judge decertified class when "a 'potentially proper class' exists and can easily be created" and because of late stage of the case there were "concern[s] about possible prejudice to members of a class"). "[E]ve-of-trial decertification could adversely and unfairly prejudice class members, who may be unable to protect their own interests." *Gortat v. Capala Bros.*, No. 07-CIV-3629 (ILG) (SMG), 2012 WL 1116495, at *2 (E.D.N.Y. Apr. 3, 2012), *aff'd,* 568 F. App'x 78 (2d Cir. 2014); *see also Easterling v. Connecticut Dep't of Correction*, 278 F.R.D. 41, 44 (D. Conn. 2011) ("A court should be wary of revoking a certification order completely at a late stage in the litigation process.").

FLSA collective action requirements are "considerably less stringent" than Rule 23's requirements. *See Alonso*, 2011 WL 4389636, at *3 ("[T]he 'similarly situated' requirement [for FLSA collective actions] is considerably less stringent that [sic] the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate.'" (internal citations omitted)). Nonetheless, because both FLSA collective actions and Rule 23 class actions are based on principles of the efficient resolution of common issues of law or fact, "it is not mere coincidence that courts facing parallel motions to decertify an FLSA collective action . . . and to certify a class action under Rule 23 have tended to allow either both actions or neither to proceed on a collective basis." *Ruiz*, 93 F. Supp. 3d at 298-99.

## 2. Discussion

The Court finds that Defendants have not demonstrated a "significant intervening event" or shown any "compelling reasons" to justify the Court "disturb[ing] its prior findings" and prior ruling to certify the class. *Mazzei*, 308 F.R.D. at 106. With respect to Rule 23 class decertification, Defendants' arguments are the same arguments made with respect to FLSA collective action decertification and, as discussed above, Defendants have not been able to show that the case requires individualized proof of liability or damages in a way that prevents class or collective treatment.

In support of its argument for decertifying the Rule 23 class in this case, Defendants primarily cite to *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279 (S.D.N.Y. 2015). and argue that the question of liability will be individualized for each class member. As discussed above, in relation to the disparate factual and employment settings prong of the FLSA decertification analysis, *Ruiz* is inapplicable to this case because that defendant employer, unlike Hoyt Livery, had a policy and practice of (a) recording employees' hours, including overtime hours, and (b)

paying employees time and a half overtime pay when they worked over 40 hours a week.  *See id.*
at 284-85.

The *Ruiz* plaintiffs could not, therefore, fulfill the requirement set by *Wal-Mart Stores,*
*Inc. v. Dukes*, 564 U.S. 338 (2011), that plaintiffs who seek to challenge an unlawful uniform
employment policy "present qualitatively and quantitatively sufficient evidence demonstrating
that policy" and that it applied to the entire class.  *Ruiz*, 93 F. Supp. 3d at 288.  Unlike the *Ruiz*
plaintiffs, the Plaintiff here already successfully demonstrated that Hoyt Livery had a uniform
policy in place that applied to all drivers and that left Defendants liable under the FLSA, as a
matter of law.  Summ J. Order. At 17-18.  Because all class members were subject to the same
policies, this Court has already found Defendants liable to the class on the basis of Hoyt Livery's
uniform policies that applied to the entire class.

Defendants also attempt to argue that individualized damage calculations will
predominate over the questions common to the class.  *See* Def.'s Decert. Br. at 28.  Defendants
cite to *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1440 (2013).  "*Comcast's* holding was
narrow[]. *Comcast* held that a model for determining classwide damages relied upon to certify a
class under Rule 23(b)(3) must actually measure damages that result from the class's asserted
theory of injury; but the Court did not hold that proponents of class certification must rely upon a
classwide damages model to demonstrate predominance."  *Roach v. T.L. Cannon Corp.*, 778
F.3d 401, 407 (2d Cir. 2015).  Since *Comcast*, the Second Circuit has explicitly held that "the
fact that damages may have to be ascertained on an individual basis is not sufficient to defeat
class certification under Rule 23(b)(3)."  *See Roach*, 778 F.3d at 405 ("We do not read *Comcast*
as overruling these decisions.") (internal quotation marks omitted).  Defendants' argument
regarding individualized damage determinations cannot, therefore, serve as a "showing of

compelling reasons" that justifies this Court in reexamining the Rule 23 class certification in this case. *Mazzei*, 308 F.R.D. at 106.

Furthermore, "[d]amages arising from unrecorded time do not necessarily require individualized inquiries, because Plaintiffs are not required to prove such damages with exactitude." *Perez v. Isabella Geriatric Ctr., Inc.*, No. 13-CV-7453 (RA), 2016 WL 5719802, at *4 (S.D.N.Y. Sept. 30, 2016) (certifying Rule 23 class and declining to decertify FLSA collective action in case involving off the clock overtime work). This further affirms that Defendants' arguments do not warrant decertification.

Finally, this case has already moved past the summary judgment stage. Thus, the possible prejudice to the class that could result from decertification also weighs in favor of rejecting Defendants' motion. *See Woe*, 729 F.2d at 107 (noting "concern[s] about possible prejudice to members of the class"); *Easterling*, 278 F.R.D. at 44.

## III.     CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to preclude Plaintiff's expert witness from testifying. ECF No. 155. Mr. DeCusati may testify as to conclusions regarding overtime wages Defendants allegedly owe to the nine drivers for which he analyzed data in his expert reports, but he may not testify as to conclusions regarding overtime wages Defendants allegedly owe to the other thirty-eight drivers in the class. The Court **DENIES** Defendants' motion to decertify the FLSA collective action and the Rule 23 class action. ECF No. 155.

SO ORDERED at Bridgeport, Connecticut, this 8th day of December, 2016.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge